IN THE SUPREME COURT OF NORTH CAROLINA

No. 230A19

Filed 5 June 2020

IN THE MATTER OF: A.J.T.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered 22 February 2019 by Judge Betty J. Brown in District Court, Guilford County. This matter was calendared in the Supreme Court on 18 May 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Mercedes O. Chut for petitioner-appellee Guilford County Department of Health and Human Services.*

*Parker Poe Adams & Bernstein LLP, by E. Merrick Parrott and Kelsey Monk, for appellee guardian ad litem.*

*Edward Eldred for respondent-appellant mother.*

*J. Thomas Diepenbrock for respondent-appellant father.*

HUDSON, Justice.

Respondents appeal from the trial court's order terminating their parental rights to their minor child, A.J.T. (Andy).[1] In this appeal, we consider whether the

---

[1] A pseudonym has been used to protect the identity of the juvenile and for ease of reading.

trial court abused its discretion in determining that it would be in Andy's best interests to terminate respondents' parental rights. We affirm.

Background

Respondents are the biological parents of Andy, who was born in April 2004. On 22 May 2015, the Guilford County Department of Health and Human Services (DHHS) took nonsecure custody of Andy and filed a petition alleging that he was a neglected and dependent juvenile. The petition alleged that DHHS received a report on 10 April 2015 that Andy's sister, Meg, was in intensive care after experiencing issues with asthma. Although she had been to the emergency room on at least twenty-eight occasions in the past year due to her asthma, neither respondent-mother nor Meg were able to provide the names of Meg's prescriptions, and respondent-mother and Meg's adult sibling smoked cigarettes in the home. The petition further alleged that respondent-mother was abusing drugs and alcohol and that Meg had been sexually abused by respondent-father on several occasions.[2] Respondent-father sent Andy outside to play during one of the sexual assaults. Respondent-mother entered a safety plan on 24 April 2015 wherein she agreed that Meg was not to have any contact with respondent-father, yet she allowed respondent-father into the home when Meg was there on multiple occasions.

---

[2] Respondent-father is not the biological father of Meg.

On 14 January 2016, the trial court adjudicated Andy neglected and dependent. On 1 March 2016, the trial court entered a disposition order ceasing reunification efforts with respondents due to the nature of the criminal charges against them and because reunification efforts were "clearly futile and inconsistent" with Andy's health, safety, and need for a permanent home. The trial court ordered no visitation with respondents and continued custody with DHHS.

The trial court held a permanency planning hearing on 2 March 2016 and entered an order on 31 March 2016. The trial court found that respondents had been incarcerated since 10 September 2015. In connection with Meg's allegations, respondent-mother had been charged with felony child abuse by sexual act and two counts of felony aiding and abetting, and respondent-father had been charged with statutory rape and two counts of first-degree sex offense. On 8 October 2015, Andy was placed in a therapeutic foster home. Although the foster parents were having "some difficulties" with him, they were very bonded with Andy, met his daily living needs, and continued to support him academically and emotionally. Andy was "struggl[ing] in school academically and behaviorally[,]" and since September 2015, he had been attending therapy and working on impulse control and anger management skills. The trial court established a primary plan of reunification with a concurrent secondary plan of adoption.

Over the next two years, the trial court held hearings and entered four successive permanency planning review orders. During this period, the trial court

followed both respondent-mother and respondent-father through various unsuccessful but continuing efforts to receive parenting assessments and services, and in and out of incarcerations. Also, during this period, Andy was placed in different foster homes that were intended to be therapeutic, in attempts to address his various problematic behaviors. Throughout this period, up through the order entered 31 October 2017, the trial court maintained the primary permanent plan as reunification, with concurrent secondary plans of adoption and guardianship, and then just adoption.

The trial court held a permanency planning review hearing on 27 September 2017 and entered an order on 31 October 2017. Respondent-mother informed a social worker in August 2017 that her mother's home may be foreclosed upon. Her weekly individual therapy sessions were scheduled to start in October 2017. Respondent-father began sexual offender counseling in September 2017. The trial court found that since Andy's placement in a group home, his mood, anger, academic programming, respect towards adults, and manipulation had greatly improved. At a September 2017 treatment team meeting, the team discussed beginning the search for a therapeutic foster home. Prospective foster parents had been located, and a visit was scheduled.

On 14 March 2018, a permanency planning review hearing was held. The trial court entered an order on 23 April 2018, changing the primary permanent plan to adoption, with a secondary plan of guardianship. The trial court found that respondent-mother had not been receiving individual therapy on a regular basis and

had last seen her therapist in January 2018. In violation of respondent-father's conditions of probation, respondent-mother had allowed respondent-father to stay with her. As a result, respondent-father was serving a ninety-day sentence for violating his probation. The trial court found that on 3 November 2017, Andy entered a therapeutic foster home. He stayed in that home for only two weeks due to concerns with the foster parents' behaviors. He was placed in another foster home on 20 November 2017. The home appeared to be a "good fit" for Andy. He had formed a strong bond with the foster parents, especially the foster mother, and appeared to be very comfortable in the home. Andy expressed a strong desire to remain in his current placement. He was in the eighth grade and was having a "more successful" year in school, and he was refraining from demonstrating the "same aggressive and defiant behaviors that he ha[d] in the past." The trial court thus changed the primary permanent plan as noted above.

On 16 May 2018, DHHS filed a petition to terminate respondents' parental rights alleging that respondents: (1) neglected Andy, and such neglect was likely to recur if he were returned to respondents, *see* N.C.G.S. § 7B-1111(a)(1) (2019); (2) willfully left Andy in foster care or placement outside the home for more than twelve months without making reasonable progress to correct the conditions that led to his removal, *see* N.C.G.S. § 7B-1111(a)(2); and (3) willfully failed, "for a period of six continuous months immediately preceding the filing of the petition," to pay a

reasonable portion of the cost of care for Andy although physically and financially able to do so, *see* N.C.G.S. § 7B-1111(a)(3).

The trial court held a permanency planning hearing on 18 January 2019 and entered an order on 1 February 2019. The trial court found that on 25 October 2018, Andy was placed in a Level II group home due to an increase in unsafe and defiant behaviors and was "responding relatively well." The trial court further found that, although historically Andy had a "very difficult time behaviorally in school[,]" he had begun to show improvement since the beginning of the 2018 to 2019 school year.

Following a hearing held on 29 January 2019, the trial court entered an order on 22 February 2019 finding all three grounds for termination alleged by DHHS. The trial court further concluded that it was in Andy's best interests that respondents' parental rights be terminated, and the court terminated respondents' parental rights. Respondents appeal.

## Analysis

On appeal, respondents argue that the trial court abused its discretion by determining that termination of their parental rights was in Andy's best interests. Specifically, they challenge several of the dispositional findings of fact and contend that the findings do not support the conclusion that termination was in Andy's best interests. We disagree.

Our Juvenile Code provides for a two-step process for the termination of parental rights—an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-

1109, -1110. At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of one or more grounds for termination pursuant to section 7B-1111 of the North Carolina General Statutes. *Id.* § 7B-1109(e), (f). Here, the trial court adjudicated the existence of three grounds to terminate respondents' parental rights: neglect under N.C.G.S. § 7B-1111(a)(1), willfully leaving the juvenile in foster care or placement outside the home for more than twelve months without making reasonable progress to correct the conditions that led to the juvenile's removal under N.C.G.S. § 7B-1111(a)(2), and willful failure to pay a reasonable portion of the cost of care for Andy although physically and financially able to do so under N.C.G.S. § 7B-1111(a)(3). Respondents have not challenged the adjudicatory portion of the trial court's ruling, and thus this issue is not before us.

If the trial court finds grounds to terminate parental rights pursuant to N.C.G.S. § 7B-1111(a), it then proceeds to the dispositional stage where it must "determine whether terminating the parent's rights is in the juvenile's best interest." *Id.* § 7B-1110(a). The trial court's assessment of a juvenile's best interest at the dispositional stage is reviewed only for abuse of discretion. *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (citing *In re L.M.T.*, 367 N.C. 165, 171, 752 S.E.2d 453, 457 (2013) and *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984)). "[A]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a

reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107, 772 S.E.2d 451, 455 (2015) (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)). "The trial court's dispositional findings of fact are reviewed under a 'competent evidence' standard." *In re K.N.K.*, 839 S.E.2d 735, 740 (N.C. 2020) (citation omitted).

In deciding whether termination of parental rights is in the best interests of the juvenile,

> the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a).

Here, the trial court made the following findings of fact addressing each of the factors in subsection 7B-1110(a):

> 25. It is in the best interest of the juvenile that the parental rights of [respondent-mother and respondent-father] be terminated, based upon the following factors:

A. The juvenile is 14 years of age.

B. The likelihood of his adoption is high. Despite some testimony about some challenging behavior, he is smart, very mature for his age, adaptable and pleasant. He presents today as stable and mature about why he is here and how he got to this point.

C. Termination will aid in the adoption of the juvenile, which is the most permanent plan.

D. The juvenile is very bonded with his mother. It is obvious to the Court that the mother loves the juvenile. There have been no authorized visits, even though there were a number of unauthorized visits. The juvenile seldom mentions his father, although he expresses his desire to go home and live with his mother.

E. The juvenile has been living at his current group home since late October of 2018. He has had approximately 13 placements since he came into DHHS custody. Although he has not had time to create a bond in his current home, he has bonded with foster parents in previous placements, and he has easily adjusted to different settings.

First, in regards to Andy's age, respondents acknowledge that the trial court correctly found that Andy was fourteen years old at the time of the hearing. Yet, citing to *Mintz v. Mintz*, 64 N.C. App. 338, 341, 307 S.E.2d 391, 393 (1983)—which is not binding on this Court—respondent-mother argues that due to Andy's age, the trial court should consider his "obvious" preference to live with her. In *Mintz*, the Court of Appeals stated that as a child approaches the age of fourteen, their custodial preference on visitation *may* be considered by the trial court, but that "his choice is

not absolute or controlling." *Id.* at 340–41, 307 S.E.2d at 393. *Mintz*, however, is readily distinguishable from the case before us. In *Mintz*, the Court of Appeals addressed parental visitation rights in the context of a divorce action, not an assessment by the trial court of a child's best interest in a termination of parental rights proceeding. *Id.* at 338, 307 S.E.2d at 392. Moreover, the Court of Appeals affirmed that it remained the duty of the trial judge to determine "the weight to be accorded the child's preference, to find and conclude what is in the best interest of the child, and to decide what promotes the welfare of the child." *Id.* at 341, 307 S.E.2d at 394.

Respondent-mother further contends that "Andy's age and maturity level, and his obvious awareness of his and his family's circumstances, weigh against the termination decision." Here, the trial court made a dispositional finding that "[Andy] is smart, very mature for his age, adaptable and pleasant. He presents today as stable and mature about why he is here and how he got to this point." We have noted that

> an important aspect of the trial court's role as finder of fact is assessing the demeanor and credibility of witnesses, often in light of inconsistencies or contradictory evidence. It is in part because the trial court is uniquely situated to make this credibility determination that appellate courts may not reweigh the underlying evidence presented at trial.

*In re J.A.M.,* 372 N.C. 1, 11, 822 S.E.2d 693, 700 (2019). Thus, any reasonable inferences the trial court drew based on Andy's age, demeanor, or attitude—and any

determinations it made as to the weight of those inferences—were solely for the trial court to make. *See In re Z.L.W.*, 372 N.C. 432, 437, 831 S.E.2d 62, 66 (2019).

Respondent-father argues that Andy's age weighs against the trial court's determination that termination of his parental rights was in his best interest because a child over the age of twelve is required to consent to his adoption. *See* N.C.G.S. § 48-3-601 (2019). He asserts that, "Andy will have the right to object to the adoption, compounding the difficulty in procuring permanency for him." However, the court may waive the consent requirement "upon a finding that it is not in the best interest of the minor to require the consent." *Id.* § 48-3-603(b)(2). Thus, even assuming *arguendo* that Andy fails to consent at the time of an adoption, his lack of consent would not preclude him from being adopted.

Second, respondents challenge the trial court's finding that the likelihood of Andy's adoption is high. While recognizing that the trial court appears to have based its finding on a report filed by the *guardian ad litem* (GAL) and the GAL's testimony at the termination hearing, they assert the report and testimony is "undercut" and "directly contradicted" by Andy's history while in DHHS custody. Respondent-mother contends that the trial court's finding is not based on convincing evidence and respondent-father argues that the trial court's finding is not based on competent evidence, given Andy's behavioral and psychiatric issues and multiple placements while in foster care for nearly four years.

The GAL's 29 January 2019 report, which was admitted into evidence, specifically stated that the "likelihood of adoption for [Andy] is high." The report further stated that, "[Andy] is a smart, charming young man who easily engages in conversation. Although [Andy] has often struggled to find stability since entering DHHS custody, this GAL fully believes that when the right family is found for [Andy], he will find permanence." In addition, at the termination hearing, the GAL testified that adoption was "likely, if he finds the right family . . . [b]ecause he is a very smart, charming young man who engages easily with adults, and I think that once he finds the right family, he would be able to find permanence." The court's finding of fact that Andy had a high likelihood of adoption is supported by record evidence and is thus binding on appeal. *See In re A.U.D.*, 373 N.C. 3, 12, 832 S.E.2d 698, 704 (2019) ("To be sure, evidence existed that would have supported a contrary decision. But this Court lacks the authority to reweigh the evidence that was before the trial court.").

Third, with respect to the trial court's finding that termination will aid in Andy's adoption, respondent-mother appears to suggest that this finding amounts to a mere conclusory recitation of "magic words." She cites to *In re B.C.T.*, 828 S.E.2d 50 (N.C. Ct. App. 2019), to support her contention. The Court of Appeals' decision in *In re B.C.T.* is not binding on this Court, and respondent-mother's reliance on it is otherwise misplaced because it is distinguishable. In *In re B.C.T.*, the trial court adjudicated that the respondent-mother's child was neglected and concluded "[t]hat it is in the best interests of the Juvenile for [Ms. Mitchell, a family friend,] to be

granted the care, custody, and control of the Juvenile." *Id.* at 58. The Court of Appeals held that because there was almost no evidence regarding Ms. Mitchell, her home, or care of the child, a conclusory recitation of the best interest standard was insufficient to support the trial court's conclusion. *Id.* In the instant case, we are not convinced that the trial court was making a conclusory recitation. The permanent plan was adoption, and termination of parental rights is undoubtedly a prerequisite to accomplishing that plan.

Fourth, while respondents do not challenge the trial court's finding that Andy "is very bonded" with respondent-mother and "seldom mentions" respondent-father, they contend that this factor does not support the trial court's conclusion that it is in Andy's best interest to terminate their parental rights. It is clear from the trial court's findings, however, that it considered several factors in making the best interests determination. "[T]he bond between parent and child is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and the trial court is permitted to give greater weight to other factors." *In re Z.L.W.*, 372 N.C. at 437, 831 S.E.2d at 66.

Finally, respondents challenge the trial court's finding regarding Andy's relationship with "the proposed adoptive parent, guardian, custodian, or other permanent placement." N.C.G.S. § 7B-1110(a)(5). Specifically, respondent-mother contends that DHHS failed to identify any permanent placement for Andy, "so Andy has no relationship with any proposed caretaker." We note that the absence of an adoptive placement for a juvenile at the time of the termination hearing is not a bar

to terminating parental rights. *See In re A.R.A.*, 373 N.C. 190, 200, 835 S.E.2d 417, 424 (2019) (affirming the district court in terminating parental rights even though "[the child] was not currently in a pre-adoptive placement"); *See also In re D.H.*, 232 N.C. App. 217, 223, 753 S.E.2d 732, 736 (2014) ("[T]he absence of an adoptive placement for a juvenile at the time of the termination hearing is not a bar to terminating parental rights."). Thus, her argument is unavailing.

Respondent-mother additionally argues that the portion of the trial court's finding that provides Andy "easily adjusted to different settings" is not supported by the record. This portion of the trial court's finding, however, is supported by record evidence and the GAL's testimony. In the 31 March 2016 permanency planning order, the trial court found that Andy had been placed in a therapeutic foster home and "adjusted well," developing a close bond with the foster parents. In the 31 October 2017 permanency planning order, the trial court found that while in a group home, Andy had "shown great improvement with his mood, his anger, his academic program[m]ing, his respect towards adults, and his manipulation." In the 23 April 2018 permanency planning order, the trial court found that the foster home in which he was placed in November 2017 appeared to be a "good fit" for him. He formed a "strong bond with the foster parents, especially the foster mother" and seemed "very comfortable" in the home. It was the "happiest the Social Worker has seen him since the start of this case." In a 29 January 2019 GAL report, the GAL stated that she had "observed [Andy] bond with previous caregivers." The GAL had also observed Andy

bond with his foster parents in his most recent foster home. He "frequently teased and joked with his foster mother, demonstrating a level of comfort in the home and trust with her." When asked at the termination hearing as to how Andy was currently adjusting in a group home, the GAL testified that "[h]e's doing okay. . . . [O]nce he got into this home and kind of adjusted, his grades greatly improved and some behavioral issues improved." Based on the foregoing evidence, the trial court made the reasonable inference that Andy had the ability to easily adjust to different settings.

Respondent-father, on the other hand, argues that the portion of the trial court's finding stating that Andy had been in thirteen different placements since entering DHHS custody undermines the trial court's conclusion that termination was in Andy's best interests and "only emphasizes the point that there is no proposed adoptive parent, and underscores that no permanent proposed placement was in existence at the time of the hearing." He asserts that this case is similar to the circumstances found in *In re J.A.O*, 166 N.C. App. 222, 601 S.E.2d 226 (2004). We disagree.

As previously stated, the lack of a proposed adoptive placement for Andy at the time of the termination hearing is not a bar to terminating parental rights. *See In re A.R.A.,* 373 N.C. at 200, 835 S.E.2d at 424; *In re D.H.*, 232 N.C. App. at 223, 753 S.E.2d at 736. Furthermore, *In re J.A.O.* is not binding on this Court, and we find the circumstances here to be readily distinguishable. In *In re J.A.O.*, the juvenile was

fourteen years old at the time of the termination hearing. He had been in foster care since he was eighteen months old and had been placed in nineteen treatment centers. *In re J.A.O.*, 166 N.C. App. at 227, 601 S.E.2d at 230. The juvenile's GAL opined that it was in the juvenile's best interests not to terminate the respondent's parental rights. *Id.* at 225, 601 S.E.2d at 229. The GAL testified that it was "highly unlikely that a child of [the juvenile's] age and physical and mental condition would be a candidate for adoption, much less selected by an adopted family." *Id.* at 228, 601 S.E.2d at 230. The Court of Appeals stated that although there was a small possibility that the juvenile would be adopted, the "remote chance of adoption in this case" did not "justif[y] the momentous step of terminating respondent's parental rights." *Id.* Accordingly, the Court of Appeals held that the trial court abused its discretion in determining that it was in the juvenile's best interests to terminate the respondent's parental rights. *Id.* Here, the GAL distinctly testified that it was likely Andy would be adopted and included in her report that the likelihood of Andy's adoption was high. Notably, the GAL recommended termination of respondents' parental rights. Moreover, while the mother in *J.A.O.* had made reasonable progress towards correcting the conditions that led to the removal of her son from her care, respondents here failed to make such progress.

The remainder of respondents' arguments concern whether the statutory criteria of N.C.G.S. § 7B-1110 as a whole weigh against terminating their parental rights. The trial court's dispositional findings demonstrate it considered the relevant

statutory criteria of N.C.G.S. § 7B-1110(a). The trial court gave due consideration to Andy's age, the likelihood of his adoption, whether termination would facilitate in the achievement of the permanent plan, Andy's bond with respondents, and the quality of the relationship between Andy and his current placement. Respondents essentially ask this Court to do something it lacks the authority to do—to reweigh the evidence and reach a different conclusion than the trial court. We are satisfied that the trial court's conclusion that termination of respondents' parental rights was in Andy's best interests was neither arbitrary nor manifestly unsupported by reason. For the reasons stated above, we affirm the 22 February 2019 order of the trial court terminating respondents' parental rights.

AFFIRMED.