IN THE MATTER OF: J.A.O.

No. COA03-629

(Filed 7 September 2004)

**Termination of Parental Rights— neglect—abandonment—remote chance of adoption**

    The trial court abused its discretion by terminating respondent mother's parental rights to her sixteen-year-old son based on neglect and abandonment under N.C.G.S. § 7B-1111(a)(1) and (7), because: (1) it cannot be in the minor child's best interest to terminate respondent's parental rights and thereby render the child

**IN RE J.A.O.**

[166 N.C. App. 222 (2004)]

a legal orphan; (2) it is highly unlikely that a child of this age and physical and mental condition would be a candidate for adoption, much less selected by an adoptive family; and (3) the remote chance of adoption does not justify the momentous step of terminating respondent's parental rights.

Appeal by respondent from order entered 11 December 2002 by Judge Peter L. Roda in Buncombe County District Court. Heard in the Court of Appeals 26 February 2004.

*John Adams, Esq., for petitioner-appellee Buncombe County Department of Social Services.*

*Michael Tousey and Judy Rudolph for guardian ad litem-appellee.*

*Mary Exum Schaefer for respondent-appellant.*

TIMMONS-GOODSON, Judge.

Respondent appeals the trial court order terminating her parental rights to her sixteen-year-old son, Jeff.[1] For the reasons discussed herein, we reverse.

The facts and procedural history pertinent to the instant appeal are as follows: On 15 May 2002, Buncombe County Department of Social Services ("DSS") filed a petition to terminate respondent's parental rights ("the petition") to her minor son, Jeff. The petition alleged that sufficient grounds existed to terminate respondent's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) (2003) and N.C. Gen. Stat. § 7B-1111(a)(7) (2003). On 21 October 2002, the trial court conducted a hearing on the petition. After hearing testimony and receiving evidence from the parties, the trial court determined that sufficient grounds existed to terminate respondent's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) (2003) and N.C. Gen. Stat. § 7B-1111(a)(7) (2003). The trial court also determined that it was in Jeff's best interest to terminate respondent's parental rights. Accordingly, in an order entered 11 December 2002, the trial court terminated respondent's parental rights to Jeff. Respondent appeals.

The dispositive issue on appeal is whether the trial court erred in terminating respondent's parental rights. Because we conclude that

---

1. For the purposes of this opinion, we will refer to the minor child by the pseudonym "Jeff."

the trial court abused its discretion in terminating respondent's parental rights, we reverse the trial court's order.

In the instant case, the trial court concluded at the adjudicatory stage that sufficient grounds existed to terminate respondent's parental rights based on neglect and abandonment pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) and (7). At the dispositional stage, respondent argued that it was in Jeff's best interest not to terminate respondent's parental rights because (i) respondent had taken sufficient steps to correct the problems that led to the grounds for termination, and (ii) adoption of Jeff was highly unlikely. The trial court nevertheless concluded that it was in Jeff's best interest to terminate respondent's parental rights. We disagree.

Termination of parental rights involves a two-stage process. *In re Blackburn*, 142 N.C. App. 607, 610, 543 S.E.2d 906, 908 (2001). At the adjudicatory stage, "the petitioner has the burden of establishing by clear and convincing evidence that at least one of the statutory grounds listed in N.C. Gen. Stat. § 7B-1111 exists." *In re Anderson*, 151 N.C. App. 94, 97, 564 S.E.2d 599, 602 (2002). "If the trial court determines that grounds for termination exist, it proceeds to the dispositional stage, and must consider whether terminating parental rights is in the best interests of the child." *Id.* at 98, 564 S.E.2d at 602. "[This Court] review[s] the trial court's decision to terminate parental rights for abuse of discretion." *Id.*

"Evidence heard or introduced throughout the adjudicatory stage, as well as any additional evidence, may be considered during the dispositional stage." *Blackburn*, 142 N.C. App. at 613, 543 S.E.2d at 910. "[E]ither party may offer relevant evidence as to the child's best interests." *In re Pierce*, 356 N.C. 68, 76, 565 S.E.2d 81, 86 (2002). "Such evidence may therefore include facts or circumstances demonstrating either: (1) the reasonable progress of the parent, or (2) the parent's lack of reasonable progress that occurred before or after . . . the filing of the petition for termination of parental rights." *Id.* at 76, 565 S.E.2d at 86-87.

In the instant case, respondent's evidence tended to show that respondent had made reasonable progress to correct the conditions that led to the petition to terminate her parental rights. Although respondent admitted to stopping visits with Jeff in 1999, she explained that she stopped visiting Jeff because he had been transferred to Cumberland Hospital in Virginia, more than six hours away

from respondent's residence. Debbie Ensley ("Ensley"), the social worker in charge of Jeff's case, testified that respondent had frequently visited Jeff prior to 1997. Ensley further testified that respondent was asked by DSS to suspend her visitations with Jeff in 1997 because of an increase in Jeff's violent behavior. Respondent complied with DSS's request, and remained "an active part of the treatment team at that point." Respondent continued visitations with Jeff until 1999, when Jeff was transferred to Park Ridge Hospital and subsequently Cumberland Hospital.

Respondent testified that when Ensley notified her of Jeff's transfer to Cumberland Hospital, Ensley "told me that he was going—they were going to send him up to Virginia, that I couldn't see him." Respondent testified that she was told in 1997 that her visits with Jeff were "making him worse." Respondent testified that she did not visit Jeff in Virginia because she did not have a vehicle or other transportation to Virginia, and she "didn't want [Jeff] to have to suffer like he did[.]" Respondent testified that she nevertheless remained in frequent contact with the Mashburns, Jeff's foster parents. Respondent also testified that she had written Jeff letters after he had been subsequently transferred to a hospital in Florida, but that the letters were never delivered. Respondent further testified that she now owns a vehicle, has had stable employment since 1999, and lives in a rented efficiency apartment. Two witnesses testified to respondent's love and care for Jeff and her efforts to reunite with her son. Betty,[2] respondent's sister, testified that respondent is a "loving" mother and is currently looking for a larger apartment, "hoping she'll get [Jeff] back." Brenda McPherson ("McPherson"), a life-long friend of respondent, testified that respondent is "a very good mother, [a] very loving and caring mother" who "has always showed a lot of concern [for Jeff]." McPherson testified that she has had experience helping sexually abused and hyperactive children as a member of Angel Group, a support group, and would be willing to help respondent and Jeff. Respondent also testified that she has a support system of family and friends as well as a "pediatrician that will help me in any way" with Jeff.

Dee Shelton ("Shelton"), Jeff's guardian ad litem, also argued that it was in Jeff's best interest not to terminate respondent's parental rights. In a 16 October 2002 report to the trial court, Shelton made the following observations and conclusions:

2. For the purposes of this opinion, we will refer to respondent's sister by the name "Betty."

IN RE J.A.O.

[166 N.C. App. 222 (2004)]

The facts of this case may show that [respondent] has had and would continue to have difficulties parenting [Jeff] and it is not likely that [respondent] would be able to adequately provide the constant medical and mental health care that [Jeff] currently needs or will need in the future. [Respondent] is remorseful that she was unable to attend to her child's needs in the proper manner and that her ex-husband may have disciplined [Jeff] harshly.

[Respondent] and foster mother both informed this GAL that the professionals involved over the years have not been in agreement as to diagnosis or cause of [Jeff's] problems. The current therapist believes that [Jeff's] problems exist due to his mental state and not environment. The Department of Social Services petition fixes the blame for [Jeff's] situation on his mother. This GAL has been unable to establish an opinion of who or what is to blame for the very sad state this child is in. However, his parent has not been allowed to be a part of his life for several years. During that time, a number of caring professionals have made gallant efforts to meet [Jeff's] needs, without noticeable improvement.

This GAL cannot understand the need to terminate the rights of [respondent] when it is unlikely that another parent or family will be sought to come forward for this child. The one family who are familiar with [Jeff] and profess and show love for him do not consider adoption of this child as they recognize their limitations. . . .

This GAL does not believe that terminating the rights of [respondent] at this time, ultimately leaving [Jeff] an orphan, would be in the best interest of [Jeff]. While it may be difficult to reintroduce his mother into his life, he has so few people to show concern for him personally, it should be considered with the assistance of a therapist. [Respondent] may provide a valuable asset to his future when he no longer has a whole team of professional people looking after his needs.

At the dispositional stage, Shelton reiterated her concerns regarding the termination of respondent's parental rights. At the close of the disposition hearing, counsel for the guardian ad litem argued:

Again, this is a pretty unique situation. I don't know that this has happened in the entire time I've been a guardian ad litem or attorney advocate, but we do not believe that it would be in the best interest to terminate the rights [to] this young man. I think we'd

be making him a legal orphan to no good advantage. He is 14 years old[3] and over 200 pounds, and as you can see by this assessment of him, he is quite violent. Judge, [Jeff's current physicians] think they're going to be able to put him in a Level 3 placement. That's just not going to happen. A Level 4 placement [in North Carolina] says they can't handle him. So I don't know what's going to happen and where this youngster's going to go, but I just don't see that adoption—the guardian does not see that adoption is something that's really in [Jeff's] best interest and in any way is going to assist him and will, indeed, cut him off from any family that he might have. . . . I think the bottom line is that the guardian just does not believe this would be in the best interest of [Jeff] to terminate his parental rights, based on—the parental rights of his mother.

After reviewing the evidence presented at the adjudicatory and dispositional stages, we conclude that the trial court abused its discretion in determining that it was in Jeff's best interest to terminate respondent's parental rights. "One of the underlying principles guiding the trial court in the dispositional stage is the recognition of the necessity for any child to have a permanent plan of care at the earliest possible age, while at the same time recognizing the need to protect all children from the unnecessary severance of a relationship with biological parents or legal guardians." *Blackburn,* 142 N.C. App. at 612, 543 S.E.2d at 910. "As our Supreme Court noted in *In re Montgomery,* the legislature has properly recognized that in certain situations, even where the grounds for termination could be legally established, the best interests of the child indicate that the family unit should not be dissolved." *Id.* at 613, 543 S.E.2d at 910 (citing *In re Montgomery,* 311 N.C. 101, 107, 316 S.E.2d 246, 251 (1984)). Because we have determined that it cannot be in Jeff's best interest to terminate respondent's parental rights and thereby render Jeff a "legal orphan," we conclude that the instant case presents the situation contemplated by our legislature and recognized by the Court in *Montgomery.*

As detailed above, Jeff is a troubled teenager with a woefully insufficient support system. He has been placed in foster care since the age of eighteen months and has been shuffled through nineteen treatment centers over the last fourteen years. Respondent, Jeff's biological mother, is the only family member connected to and inter-

---

3. At the time of the termination hearing, Jeff was fourteen years old. However, as discussed *supra,* Jeff is currently sixteen years old.

ested in Jeff. His biological father was not present at the termination proceeding and could not be located through judicial summons. Although Jeff's foster family have shown support and care for him, they are unwilling to adopt him and undertake the important responsibilities associated with caring for an individual who possesses significant and life-long debilitating behaviors. Jeff has a history of being verbally and physically aggressive and threatening, and he has been diagnosed with bipolar disorder, attention deficit hyperactivity disorder, pervasive developmental disorder, borderline intellectual functioning, non-insulin dependent diabetes mellitus, and hypertension. As the guardian ad litem argued at trial, it is highly unlikely that a child of Jeff's age and physical and mental condition would be a candidate for adoption, much less selected by an adoptive family.

We recognize that, as the trial court noted, a small "possibility" of Jeff's adoption nevertheless remains. However, we are unconvinced that the remote chance of adoption in this case justifies the momentous step of terminating respondent's parental rights. Thus, after "balancing the minimal possibilities of adoptive placement against the stabilizing influence, and the sense of identity, that some continuing legal relationship with natural relatives may ultimately bring, we must conclude that termination would only cast [Jeff] further adrift." *In re A.B.E.*, 564 A.2d 751, 757 (D.C. Cir. 1989). Therefore, we hold that the trial court abused its discretion by terminating respondent's parental rights to Jeff. Accordingly, we reverse the trial court's order and remand the case for further proceedings.

Reversed and remanded.

Judges BRYANT and ELMORE concur.