IN THE SUPREME COURT OF NORTH CAROLINA

No. 277A19

Filed: 17 July 2020

IN THE MATTER OF: J.J.B., J.D.B.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 8 April 2019 by Judge William B. Davis in District Court, Guilford County. This matter was calendared in the Supreme Court on 19 June 2020 but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Mercedes O. Chut for petitioner-appellee Guilford County Department of Health and Human Services.*
>
> *Poyner Spruill LLP, by Andrew H. Erteschik and N. Cosmo Zinkow, for appellee Guardian ad Litem.*
>
> *Robert W. Ewing for respondent-appellant mother.*
>
> *Surratt Thompson & Ceberio PLLC, by Christopher M. Watford, for respondent-appellant father.*

EARLS, Justice.

Respondents, mother and father of the minor children, appeal from the trial court's order terminating their parental rights to J.J.B. and J.D.B. ("John" and "Jessica").[1] After careful review, we affirm.

---

[1] The minor children J.J.B. and J.D.B. will be referred to throughout this opinion as "John" and "Jessica," which are pseudonyms used to protect the identity of the juveniles and

On 19 July 2016, the Guilford County Department of Health and Human Services (DHHS) received a Child Protective Services (CPS) report claiming that John and Jessica lived in an injurious environment due to domestic violence between respondents. The report alleged that respondent-father had entered the respondent-mother's home while intoxicated and assaulted her. Respondent-mother was observed to have several injuries, including bleeding from both nostrils, a swollen upper lip, a contusion to her lip, and a three-inch-long scratch on the right side of her neck, under her jawline. Respondent-mother told law enforcement that respondent-father hit her with "maybe like a backhand type of thing." Law enforcement officers stated that they could smell alcohol on respondent-father's breath, that he was acting in an aggressive manner and making inflammatory statements, and that they eventually tasered him in order to effectuate his arrest.

On 26 July 2016, social workers interviewed John and Jessica, and the children reported seeing respondent-father push his way into their home and hit respondent-mother. John and Jessica told the social worker that respondent-mother was screaming and yelling, they were scared, and Jessica was crying. They stated that police were called to the home, and respondent-father was taken to jail.

On 29 July 2016, a Team Decision Making meeting was held, and both respondents were present. Respondent-father denied the allegations and stated that

for ease of reading.

he did not remember much of what happened. Respondent-father entered into a safety agreement in which he agreed to have no contact with the juveniles unless supervised by the paternal grandmother. Respondent-father also agreed to complete a substance abuse assessment and follow all recommendations and attend a domestic violence intervention program.

On 9 September 2016, social workers met with the juveniles' older siblings. Social workers asked them if they had seen respondent-father, and they reported having seen him on three occasions since school began on 29 August 2016, in violation of the safety agreement. Social workers also learned that the family was residing with respondent-father's sister. Social workers then visited John and Jessica at school, and they also reported having seen respondent-father.

On 23 September 2016, DHHS filed a petition alleging that John and Jessica were neglected and dependent juveniles. In addition to the events outlined in the CPS report, DHHS alleged that respondent-mother had a CPS history which included reports of sexual abuse involving John and Jessica's older siblings, substance abuse issues, and domestic violence. DHHS also alleged that respondent-mother had a criminal history which included multiple drug-related charges. DHHS further claimed that respondent-father had numerous drug-related convictions and charges and had pending misdemeanor criminal charges, including possession of marijuana paraphernalia, resisting a public officer, disorderly conduct, and assault on a female. DHHS stated that no suitable relative had been identified for placement of the

juveniles, and it was contrary to the juveniles' safety and best interests to remain in the custody of either respondent. Accordingly, DHHS obtained nonsecure custody of the juveniles and placed them in a group home.

On 5 January 2017, the trial court adjudicated John and Jessica neglected and dependent juveniles. Respondent-mother was ordered to comply with her case plan, which included: completing a psychological evaluation and following all recommendations; participating in a domestic violence victims' group; obtaining and maintaining appropriate housing and employment; and completing a parent assessment and training program and following all recommendations. Respondent-father was also ordered to enter into a case plan with DHHS, and a meeting was scheduled for him to do so. Respondent-father subsequently entered into a case plan, which included: completing a psychological evaluation and substance abuse assessment and following all recommendations; participating in a domestic violence intervention program; obtaining and maintaining appropriate housing and employment; and completing a parent assessment and training program and following all recommendations. Both respondents were granted separate, supervised visitation. On 8 February 2017, the trial court set the permanent plan for the juveniles as reunification with a concurrent plan of adoption.

On 15 September 2017, John and Jessica were placed in a licensed foster home after a disrupted trial home placement with respondent-mother. In a permanency planning review order entered on 9 May 2018, the trial court found that respondents

were not making adequate progress, were minimally participating and cooperating with DHHS and the guardian ad litem for the juveniles, and were acting in a manner inconsistent with the juveniles' health and safety. The trial court changed the primary permanent plan for the juveniles to adoption with a secondary permanent plan of reunification. The trial court further ordered DHHS to proceed with filing a petition to terminate respondents' parental rights.

On 29 August 2018, DHHS filed a motion to terminate respondents' parental rights on the grounds of neglect, willful failure to make reasonable progress, failure to pay support, and dependency. *See* N.C.G.S. § 7B-1111(a)(1)–(3), (6) (2017).[2] On 8 April 2019, the trial court entered an order in which it determined grounds existed to terminate respondent-father's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1)–(3), but dismissed the allegation as to N.C.G.S. § 7B-1111(a)(6). The trial court further determined that grounds existed to terminate respondent-mother's parental rights as alleged in the motion. The trial court also concluded it was in John's and Jessica's best interests that both respondents' parental rights be terminated. Accordingly, the trial court terminated their parental rights. Both respondents appeal.

Respondents argue on appeal that the trial court erred when it determined termination of their parental rights was in John's and Jessica's best interests. We conclude that the trial court's ruling was not an abuse of discretion.

---

[2] This statute was amended in non-pertinent part effective 1 October 2018 by N.C. Session Laws 2018-47, § 2 (June 22, 2018).

A termination-of-parental-rights proceeding consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019); *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). If, during the adjudicatory stage, the trial court finds grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), it proceeds to the dispositional stage where it must "determine whether terminating the parent's rights is in the juvenile's best interest" based on the following factors:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2019).

Both respondents initially argue that this Court should utilize a *de novo* standard of review on appeal, rather than an abuse of discretion standard, and that under such review it would be clear that terminating their parental rights is not in John's and Jessica's best interests. However, this Court recently "reaffirm[ed] our application of an abuse of discretion standard of review to the trial court's determination of 'whether terminating the parent's rights is in the juvenile's best

interest[s.]' " *In re Z.A.M.*, 374 N.C. 88, 99–100, 839 S.E.2d 792, 800 (2020) (quoting

N.C.G.S. § 7B-1110(a)). "Under this standard, we defer to the trial court's decision

unless it is 'manifestly unsupported by reason or one so arbitrary that it could not

have been the result of a reasoned decision.' " *Id.* at 100, 839 S.E.2d at 800 (quoting

*Briley v. Farabow*, 348 N.C. 537, 547, 501 S.E.2d 649, 656 (1998)).

In the instant case, in finding of fact 38 the trial court made the following

findings concerning the factors set forth in N.C.G.S. § 7B-1110(a):

> a. The age of the juveniles: [John and Jessica] are seven years, and seven months old.
>
> b. The likelihood of adoption for the juveniles is high. The juveniles are placed in a preadoptive home. [John and Jessica] are young and healthy with great personalities.
>
> c. The primary permanent plan for the juveniles is adoption. Termination of parental rights of each parent is necessary in order to free the juveniles for adoption and accomplish the permanent plan for the juveniles. The termination of [respondents'] parental rights will allow the juveniles to be legally free to be adopted and have the permanence they crave.
>
> d. There is a strong bond between the juveniles and [respondents]. The juveniles enjoy spending time with [respondents] and respond positively to all visits. [Respondents] have a deep love for the juveniles and care for them.
>
> e. The juveniles have a very strong bond with their current caregivers, even though they were just placed in this home three months ago. The juveniles seek comfort, advice and support from their current caregivers. [John] describes this placement as his home. [Jessica] calls the preadoptive parents "mom" and "dad". The juveniles and preadoptive

parents say their prayers together and the juveniles look to the preadoptive parents to meet their emotional needs. On January 31, 2019, [the social worker] went to the foster home to complete a routine monthly visit. The juveniles were terrified that they were going to be moved from this home and ran to the foster mother for protection.

f. The [c]ourt considers as relevant the time the juveniles have been in foster care, the number of placements the juveniles have been placed in, and that the juveniles are thriving in the[ir] current foster/preadoptive home. [John's] mental health behaviors have decreased, [Jessica] is eating more, and her medical condition of psoriasis has improved. Although the juveniles and [respondents] are bonded to one another, neither parent is in a position to provide adequate care and supervision to the juveniles as of today's hearing, nor are they likely to within the reasonably foreseeable future. [Respondents] have had more than sufficient time to address the needs that led to removal of the juveniles.

We review the trial court's dispositional findings of fact to determine whether they are supported by competent evidence. *In re K.N.K.*, 374 N.C. 50, 57, 839 S.E.2d 735, 740 (N.C. 2020). Dispositional findings not challenged by respondents are binding on appeal. *In re Z.L.W.*, 372 N.C. 432, 437, 831 S.E.2d 62, 65 (2019) (citations omitted).

The sole finding challenged on appeal is finding of fact 38(e). Respondent-father argues that the evidence did not support the trial court's finding of fact that John and Jessica have a "very strong bond" with their foster parents. However, the juveniles' guardian ad litem testified at the termination hearing that John and Jessica were "quite bonded" to their caregivers. The guardian ad litem testified that John was "very comfortable and . . . very talkative and affectionate" towards his

caregivers. The guardian ad litem witnessed John refer to his caregivers as "mom and dad" when saying his prayers. Jessica was described as being "very playful with [the caregivers] and . . . also very comfortable and jumping on backs to go up the steps[.]" In addition to the guardian ad litem's testimony, the foster care social worker testified that John and Jessica were "terrified" that they would be moved out of their foster home. The social worker testified that at one point, Jessica "literally hopped on [the] foster mom and would not let go of her and [John] was right on the side of her."

Respondent-father claims that while petitioner did produce some evidence of a bond between John and Jessica and their caregivers, it was inadequate to support the trial court's finding in light of the brief period of time they had been placed with the caregivers. Nevertheless, the above testimony permits the reasonable inference that John and Jessica were "very bonded" to their foster parents. *See In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167–68 (2016) (stating that it is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn therefrom); *see also Scott v. Scott,* 157 N.C. App. 382, 388, 579 S.E.2d 431, 435 (2003) (stating that when the trial court sits as fact-finder, it is the sole judge of the credibility and weight to be given to the evidence, and it is not the role of the appellate courts to substitute its judgment for that of the trial courts).

Respondent-father additionally contends that the trial court failed to consider the effect permanent severance would have on the juveniles in light of the uncertainty

that their current caregivers would adopt them. Respondent-father claims that, should there be no adoption, the effect of terminating respondents' parental rights would be to render John and Jessica "legal orphan[s]." *In re J.A.O.*, 166 N.C. App. 222, 227, 601 S.E.2d 226, 230 (2004).

*In re J.A.O.* is distinguishable from the instant case. In *In re J.A.O.*, the juvenile had "a history of being verbally and physically aggressive and threatening, and he ha[d] been diagnosed with bipolar disorder, attention deficit hyperactivity disorder, pervasive developmental disorder, borderline intellectual functioning, non-insulin dependent diabetes mellitus, and hypertension." *Id.* at 228, 601 S.E.2d at 230. The juvenile had "been placed in foster care since the age of eighteen months and ha[d] been shuffled through nineteen treatment centers over the last fourteen years." *Id.* at 227, 601 S.E.2d at 230. As a result, the guardian ad litem argued at trial that the juvenile was unlikely to be a candidate for adoption, and termination was not in the juvenile's best interests, because it would "cut him off from any family that he might have." *Id.* Despite this evidence, and despite finding that there was only a "small possibility" that the juvenile would be adopted, the trial court concluded that it was in the juvenile's best interests that the mother's parental rights be terminated. *Id.* at 228, 601 S.E.2d at 230. On appeal, the Court of Appeals reversed. The Court of Appeals balanced the minimal possibilities of adoption "against the stabilizing influence, and the sense of identity, that some continuing legal relationship with

natural relatives may ultimately bring" and determined that rendering *J.A.O.* a legal orphan was not in his best interests. *Id.*

Here, the evidence does not show that John or Jessica have the serious issues the juvenile had in *In re J.A.O.* The only basis for respondent-father's contention is mere speculation that because John and Jessica had been placed with their caregivers for a relatively short time, issues could arise after a "honeymoon" period, and there was no evidence of record as to why previous placements failed for John and Jessica. However, unlike the juvenile in *In re J.A.O.*, John and Jessica are in a preadoptive placement, and the trial court made an unchallenged finding that John and Jessica are highly adoptable. Additionally, while the mother in *In re J.A.O.* had made reasonable progress towards correcting the conditions which led to the removal of her son from her care, respondents here failed to make such progress. Instead, the trial court found at disposition that respondents were not in a position to provide adequate care for the juveniles and were unlikely to be able to do so for the foreseeable future. Consequently, we conclude that respondent-father's argument is without merit.

Both respondents argue that the trial court should not have terminated their parental rights in light of the strong bond they had with John and Jessica. The trial court did find that John and Jessica had a strong bond with respondents and that respondents deeply loved their children. However, "the bond between parent and child is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and the trial court is permitted to give greater weight to other factors." *In re Z.L.W.*, 372 N.C.

at 437, 831 S.E.2d at 66. Here, when considering the other factors set forth in N.C.G.S. § 7B-1110(a), the trial court found: that John and Jessica also had a strong bond with their foster parents; there was a strong likelihood of adoption; and termination of respondents' parental rights would aid in the permanent plan of adoption. The trial court also found that, when considering other relevant factors, John and Jessica were "thriving" in their preadoptive home. Furthermore, the trial court found the juveniles craved permanence, but respondents were not in a position to provide care for the juveniles, nor were they likely to be able to do so for the foreseeable future. Therefore, we conclude the trial court appropriately considered the factors set forth in N.C.G.S. § 7B-1110(a) when determining John's and Jessica's best interests and that the trial court's determination that respondents' strong bond with John and Jessica was outweighed by other factors was not manifestly unsupported by reason.

Respondents further argue that, given the strong bond between themselves and John and Jessica, the trial court should have considered other dispositional alternatives, such as guardianship. The GAL argues that this claim was abandoned because neither parent asked the trial court to consider guardianship as an alternative. More fundamentally, the paramount consideration must always be the best interests of the child. As we explained in *Z.L.W.*,

> [w]hile the stated policy of the Juvenile Code is to prevent
> "the unnecessary or inappropriate separation of juveniles
> from their parents," N.C.G.S. § 7B-100(4) (2017), we note

> that "the best interests of the juvenile are of paramount
> consideration by the court and . . . when it is not in the
> juvenile's best interest to be returned home, the juvenile
> will be placed in a *safe, permanent home within a
> reasonable amount of time," id.* § 7B-100(5) (2017)
> (emphasis added); *see also In re Montgomery*, 311 N.C. at
> 109, 316 S.E.2d at 251 (emphasizing that "the fundamental
> principle underlying North Carolina's approach to
> controversies involving child neglect and custody [is] that
> the best interest of the child is the polar star").

*Id* (alterations in original). Consequently, in *Z.L.W.*, we held the trial court did not

abuse its discretion in determining termination, rather than guardianship, was in

the best interests of the juveniles. *Id.* In the instant case, as in *In re Z.L.W.*, the trial

court's findings of fact demonstrate that it considered the dispositional factors set

forth in N.C.G.S. § 7B-1110(a) and "performed a reasoned analysis weighing those

factors." *In re Z.A.M.*, 374 N.C. at 101, 839 S.E.2d at 801. Accordingly, "[b]ecause the

trial court made sufficient dispositional findings and performed the proper analysis

of the dispositional factors," *id.*, we conclude the trial court did not abuse its discretion

by concluding that termination, rather than guardianship, was in John's and

Jessica's best interests.

Both respondents lastly argue that the trial court erred by terminating their

parental rights because statements made by the trial judge at the conclusion of the

termination hearing demonstrated that, in fact, termination was not in John's and

Jessica's best interests.  After ruling that termination of respondents' parental rights

was in the juveniles' best interests, the trial court made the following statement:

THE COURT: I will say this: this is not part of the order and you may be thinking maybe it's out of order, but I understand the pre-adoptive placement parents are here, –

MS. GERSHON: Yes.

THE COURT: – so I hope that even though parental rights have been terminated in this case, we've heard how much these children love their parents, but I hope that maybe there'll be found some ways to honor that. I'm not going to say anything more specific. I guess it's really not my place to, but to continue to honor that relationship despite the order from today's hearing.

Respondent-father asserts that the trial court's statement communicates "its belief that the children will [be] better off with being able to love their parents and by being loved by their parents." Respondent-father argues that the trial court's desire in this regard is inconsistent with its decision to terminate their parental rights.

As is clear from the context, the trial court's statement to the caregivers that they should "honor" the relationship between respondents, John, and Jessica was advice to the prospective adoptive parents, not a repudiation of the ruling just announced from the bench. Even assuming *arguendo* that the trial court had the authority to do so, the trial court's written order contains no decree that the caregivers continue the juveniles' relationship with respondents. *See, e.g., In re A.U.D.,* 373 N.C. 3, 10, 832 S.E.2d 698, 702 (2019*)* (concluding that the trial court's oral findings are subject to change before the final order was entered, and there was no error "based merely on the fact that there were differences between the findings orally rendered at the hearing and those set forth in the written order."); *see also*

N.C.G.S. § 1A-1, Rule 58 (2019) (stating that "a judgment is entered when it is reduced to writing, signed by the judge, and filed with the clerk of court"). In fact, the trial court specifically stated that the comments were not a part of its order. Additionally, the trial court's order indicates its awareness of the effect of termination by acknowledging that its "[o]rder completely and permanently terminate[d] all rights and obligations of [respondents] to the juveniles." *See* N.C.G.S. § 7B-1112 (2019) (providing that an order terminating parental rights "completely and permanently terminates all rights and obligations of the parent to the juvenile and of the juvenile to the parent arising from the parental relationship").

We therefore hold the trial court's conclusion that termination of respondents' parental rights was in John's and Jessica's best interests did not constitute an abuse of discretion. Accordingly, we affirm the trial court's order terminating respondents' parental rights.

AFFIRMED.