IN THE SUPREME COURT OF NORTH CAROLINA

No. 491A19

Filed 20 November 2020

IN THE MATTER OF: K.S.D-F., K.N.D-F.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 12 September 2019 by Judge Burford A. Cherry in District Court, Catawba County. This matter was calendared for argument in the Supreme Court on 7 October 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Marcus Almond for petitioner-appellee Catawba County Department of Social Services.*

*Elon University Guardian ad Litem Appellate Advocacy Clinic, by Senior Associate Dean Alan D. Woodlief Jr., for appellee Guardian ad Litem.*

*Wendy C. Sotolongo, Parent Defender, by J. Lee Gilliam, Assistant Parent Defender, for respondent-appellant father.*

*Robert W. Ewing for respondent-appellant mother.*

EARLS, Justice.

Respondents appeal from an order terminating their parental rights to their children K.S.D-F. (Katie) and K.N.D-F. (Kennedy).[1] Because the trial court had jurisdiction to enter the termination order and did not abuse its discretion by

---

[1] Pseudonyms used throughout the opinion to protect the children's identities and for ease of reading.

concluding that termination of respondents' parental rights was in the children's best interests, we affirm the trial court's order.

Background

On the day of Kennedy's birth in May 2008, both she and respondent-mother tested positive for marijuana, which initiated a report to Catawba County Department of Social Services (DSS). Respondent-mother admitted that she and respondent-father both smoked marijuana, and respondent-father later confirmed that he smoked marijuana every day. On 7 July 2008, the children were found by DSS to be in need of services.

On 12 August 2008, respondents participated in a Child and Family Team Meeting where they both admitted to using marijuana on a regular basis, and respondent-father stated he would continue to do so. Respondents entered into a case plan on 21 August 2008, but they refused to consent to random drug screens. Respondents were unemployed and were evicted from their residence on or about 5 September 2008. The children moved from relative to relative, and on 19 December 2008 respondent-mother agreed to place the children in a Safety Resource Placement. The children were placed with their paternal great-aunt and great-uncle (the Turners).

On 23 December 2008, DSS filed a juvenile petition alleging that Katie and Kennedy were neglected juveniles, due to respondents' failure to provide proper care, supervision, or discipline. In addition to the disclosures of drug use, unemployment,

and unstable housing, the juvenile petition alleged that respondent-mother had failed a drug screen requested by her probation officer in October 2008, respondent-father had previously relinquished his parental rights to another child after DSS filed a motion to terminate his parental rights, and both respondents had criminal records.

Following a hearing on 26 January 2009, Katie and Kennedy were adjudicated to be neglected juveniles based upon the facts alleged in the juvenile petition. At the time of the hearing, the children were in the custody of their mother but were residing with the Turners. The trial court granted custody of the children to DSS, which left the children in the Turners' care. Respondents were ordered to enter into and comply with a case plan that required them to abstain from possessing or using illicit substances; submit to drug screens; complete a substance abuse assessment, a psychological evaluation, and a parenting assessment; follow recommendations from the assessments and psychological evaluation; and maintain stable housing and employment. Respondents were allowed one hour of visitation a week.

In an order entered on 18 May 2009 after a 20 April 2009 review hearing, the trial court noted that respondent-mother had completed her mental health assessment but had missed several drug screens. Of the two drug screens she did complete, she tested positive for marijuana once. Respondent-father visited the children twice but had not contacted the social worker in several months, had not engaged in his case plan, and had not responded to messages left by the social worker or his attorney. The children remained in DSS's custody and in the care of the

Turners, though the Turners were not approved for a long-term placement after a home study was completed. Visitation remained unchanged.

In an order entered on 7 August 2009 after a 13 July 2009 review hearing, the trial court ceased reunification efforts with respondent-father due to his lack of participation. The children remained in DSS's custody and in the care of the Turners. The trial court found that respondent-mother was not in compliance with her case plan; she had missed five requested drug screens and had only attended two visitations over a fourteen-week period. Visitation with respondent-father was ceased, and respondent-mother's visitation was modified to one hour every other week.

The trial court entered a permanency planning order on 28 October 2009. Custody of the children remained unchanged, and while the trial court noted several concerns that prevented the Turners from being an appropriate long-term placement, it noted that the children were doing "very well" in their care. The trial court found that respondent-mother remained noncompliant with her case plan, noting six missed drug screens, several missed visits with the children, her continued unemployment, and her failure to "meaningfully" address the issues which brought the children into DSS's care. The trial court ceased reunification efforts with respondent-mother and ordered that the permanent plan be a concurrent plan of (1) custody/guardianship with relatives, namely the Turners, or adoption by the Turners; and (2) adoption by

a non-relative. Respondent-mother was allowed one visit per month, and the trial court restricted unauthorized contact between the children and respondent-mother.

The trial court entered a subsequent permanency planning order on 23 February 2010 following a hearing on 25 January 2010. The trial court noted respondent-father's complete lack of contact and respondent-mother's continued noncompliance with her case plan. The trial court found that while a home study would not allow the Turners to be approved to adopt the children, guardianship with the Turners was appropriate. The permanent plan was changed to custody/guardianship with relatives, namely the Turners, and custody and guardianship was granted to the Turners. The trial court prohibited visitation with respondent-father but allowed respondent-mother two hours of visitation a month, supervised by the Turners, provided that respondent-mother was "sober and appropriate." The trial court did not schedule further reviewing hearings, but it retained jurisdiction and provided that "the matter may be brought on for hearing upon motion of any party."

On 24 June 2016, DSS filed a "Motion for Review," which requested that the trial court "conduct a custody review . . . to address the children's custody, placement, and safety." The motion alleged that the Turners returned the children to respondent-mother's care in December 2015. The children also had contact with respondent-father, had witnessed illegal drug use by respondents, and had been subjected to inappropriate discipline by respondent-mother, where she slapped and hit them in

the head or face and kicked them. After respondent-mother tested positive for THC, the trial court entered an order for nonsecure custody, granting custody of the children to DSS. Katie and Kennedy were placed into foster care and were moved several times due to their behavior.

The trial court entered a permanency planning order on 5 January 2017 following a hearing on 9 December 2016. The trial court concluded that the most appropriate permanent plan remained guardianship with the Turners. The children remained in DSS's custody, but a trial home placement with the Turners was approved. Reunification with respondents was not resumed, visitation with respondent-father was denied, and respondent-mother was allowed one hour a week of visitation supervised by DSS.

In February 2017, the Turners requested that Katie and Kennedy be removed from their care due to their unmanageable behaviors. They were placed in separate foster homes. A subsequent permanency planning order entered on 26 April 2017 removed the Turners as parties in the matter. The trial court found that respondent-mother had begun working on her case plan again; she completed a parenting and substance abuse assessment, obtained stable housing and employment, and was attending all visitations. DSS maintained custody of the children, reunification efforts with respondent-mother were resumed, and the permanent plan was changed to reunification with respondent-mother, with a secondary plan of adoption.

Respondent-mother was allowed at least four, and up to twelve, hours of visitation per month, though visitation for respondent-father was not resumed.

A 13 September 2017 permanency planning order noted respondent-mother's "sporadic" visitation, missed drug screens, unemployment, and arrest for assault since the last hearing. While the permanent plan remained unchanged, respondent-mother's visitation was suspended pending two consecutive negative drug screens.

A 5 April 2018 permanency planning order found that respondent-mother had no contact with DSS since the previous hearing. She had not visited the children due to her failure to produce two consecutive negative drug screens. She missed five requested drug screens but had tested positive for cocaine and THC in January 2018 at the birth of another child. She was involved in a high-speed car chase with law enforcement, who witnessed drugs being thrown from the car during the chase. The social worker was able to reach respondent-father, who signed a case plan but did not submit to a drug screen. The primary plan was changed to adoption, with a secondary plan of reunification. Katie and Kennedy remained in foster care, though they had changed placements several times due to their behavior.

In a 25 September 2018 permanency planning order, the trial court maintained the permanent plan as adoption and changed the secondary plan to guardianship. Respondent-mother had only sporadically attended therapy to address her substance abuse concerns and failed to follow through on additional options offered by her social worker. The trial court also found she had limited contact with her social worker, was

unemployed, had missed eighteen drug screens but had tested positive for THC at a screen in April 2018, had failed to comply with three requests for a hair follicle drug screen, and DSS had been unable to verify her residence. Due to her failure to provide acceptable drug screens, she had not visited with the children. The trial court found that respondent-father did not have legal employment. He completed a substance abuse assessment but only attended one class. Like respondent-mother, he failed to submit to eighteen requested drug screens, as well as three requested hair follicle tests, though he tested positive for marijuana after submitting to a drug screen requested by his probation officer. The trial court concluded that further efforts to reunify the children with respondents "would clearly be unsuccessful and contrary to the children's best interests, safety and welfare." The children remained in foster care, and each child had changed foster placements three more times.

On 16 November 2018, DSS filed a motion to terminate respondents' parental rights. As grounds for termination, the petition alleged that the children were neglected, respondents had willfully left the children in foster care for more than twelve months without showing reasonable progress to remedy the conditions that led to the removal of the children, and respondents had failed to pay a reasonable portion of the cost of care for the children while they were in foster care. *See* N.C.G.S. § 7B-1111(a)(1)–(3) (2019).

Subsequent to a termination hearing conducted on 4 June, 3 July, 30 July, and 14 August 2019, the trial court entered an order terminating respondents' parental

rights on 12 September 2019. The trial court concluded it had jurisdiction over the proceeding and that DSS was a proper party to bring the motion before the court. It adjudicated that grounds existed to terminate respondents' parental rights due to neglect and willfully leaving the children in foster care for more than twelve months without showing reasonable progress to remedy the conditions that led to the children's removal. Based upon the evidence presented at the termination hearing, the trial court concluded that terminating respondents' parental rights was in Katie's and Kennedy's best interests. Respondents filed notices of appeal.

## Analysis

"Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage." *In re Z.A.M.*, 374 N.C. 88, 94 (2020) (citing N.C.G.S. §§ 7B-1109, -1110 (2019)). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6 (2019) (quoting N.C.G.S. § 7B-1109(f) (2017)).

On appeal, respondents do not challenge the trial court's adjudication of grounds to terminate their parental rights under N.C.G.S. § 7B-1111(a)(1), neglect, or N.C.G.S. § 7B-1111(a)(2), failure to make reasonable progress. Instead, they argue that: (1) DSS did not have standing to file the petition to terminate respondents' parental rights, which prevented the trial court from having jurisdiction to enter the

termination order; and (2) the trial court erred in making its dispositional determination that terminating their parental rights was in the children's best interests. They also contend that a de novo standard of review applies to their best interests argument. We address each argument in turn.

*Standing and Jurisdiction*

Respondents argue that the trial court lacked jurisdiction over the termination proceeding because DSS did not have standing to file a motion to terminate their parental rights, as DSS had not been given custody of the children by a court of competent jurisdiction pursuant to N.C.G.S. § 7B-1103(a) (2019). They assert that the trial court did not have subject-matter jurisdiction to enter the 15 August 2016 nonsecure custody order granting custody to DSS because there was no pending juvenile petition before the court. Specifically they claim that because DSS only filed a "Motion for Review" and not a juvenile petition, the trial court did not have jurisdiction to enter the 15 August 2016 nonsecure custody order, arguing that once the juvenile petition had been adjudicated, the nonsecure custody provisions in the Juvenile Code were no longer effective. This argument has no merit.

"The [district] court shall have exclusive original jurisdiction to hear and determine any petition or motion relating to termination of parental rights . . . ." N.C.G.S. § 7B-1101 (2019); *see also* N.C.G.S. § 7B-101(6) (2019) (defining "[c]ourt" as the district court). Jurisdiction arises upon the filing of "a properly verified juvenile petition" and extends "through all subsequent stages of the action." *In re T.R.P.*, 360

N.C. 588, 593 (2006) (citing N.C.G.S. § 7B-201(a) (2005)); *see* N.C.G.S. § 7B-201(a) (2019) ("When the court obtains jurisdiction over a juvenile, jurisdiction shall continue until terminated by order of the court or until the juvenile reaches the age of 18 years or is otherwise emancipated . . . .").

In this matter, the trial court obtained jurisdiction on 23 December 2008, when DSS filed a petition alleging that Katie and Kennedy were neglected juveniles. Following a hearing, Katie and Kennedy were adjudicated to be neglected juveniles, and the trial court ordered they be placed in the custody of DSS, "with placement in its discretion." At the time of the hearing, the children had been residing with the Turners, and the trial court ordered that the placement continue. In the 23 February 2010 permanency planning order, the trial court determined that a permanent plan for custody and guardianship with the Turners was in the children's best interests and awarded custody and guardianship to the Turners. The trial court specifically retained jurisdiction and provided that further hearings could be brought upon a motion by any party. DSS filed such a motion on 24 June 2016, seeking to address the children's "custody, placement, and safety" as it had reason to believe the children had been residing with respondent-mother since December 2015 and had contact with respondent-father, both in violation of court orders, and that the children witnessed illegal drug use and been subjected to inappropriate discipline.

Contrary to respondents' assertion, the trial court did have jurisdiction to enter the nonsecure custody order on 15 August 2016. The trial court obtained jurisdiction

on 23 December 2008 with the filing of the juvenile petition, and upon ordering custody and guardianship to the Turners in its 23 February 2010 permanency planning order, it did not terminate its jurisdiction and have a civil custody order entered but specifically retained jurisdiction and provided for further hearings through the filing of a motion by any party. *See* N.C.G.S. § 7B-911 (2019) ("Upon placing custody with a parent or other appropriate person, the court shall determine whether or not jurisdiction in the juvenile proceeding should be terminated and custody of the juvenile awarded to a parent or other appropriate person . . . ."). DSS then filed a "Motion for Review," and the trial court had jurisdiction when it entered the nonsecure custody order on 15 August 2016 granting custody of the children to DSS. DSS subsequently had standing to file the 16 November 2018 motion to terminate respondents' parental rights as DSS had been granted custody of the children. *See* N.C.G.S. § 7B-1103(a)(3) (2019) (stating that "[a]ny county department of social services, consolidated county human services agency, or licensed child-placing agency to whom custody of the juvenile has been given by a court of competent jurisdiction" has standing to file a petition or motion to terminate parental rights).

Further, in contrast to respondents' argument that the trial court entered the order for nonsecure custody without being presented with such a request in a "proper pleading," DSS did request review of custody in its "Motion for Review." Therefore, this matter is distinguishable from those cited by petitioners, *In re Transp. of Juvs.*, 102 N.C. App. 806, 807–08 (1991), where the Court of Appeals concluded that

"without an action pending before it, the district court was without jurisdiction to enter an order" *ex mero motu* to transport delinquent juveniles; and *In re McKinney*, 158 N.C. App. 441, 448 (2003), where the Court of Appeals determined that a "Motion in the Cause" that did not ask for parental rights to be terminated was insufficient to give the trial court jurisdiction to enter an order doing so.

This matter is also distinguishable from *In re Ivey*, 156 N.C. App. 398 (2003), which respondents also rely on. In *In re Ivey*, DSS filed *no* petition alleging the child to be abused or neglected, which prevented the trial court from having jurisdiction to grant DSS nonsecure custody. *Id.* at 401. Moreover, DSS presented no evidence, and the nonsecure custody order contained no findings of fact, to allow for DSS to take temporary custody prior to a petition being filed. *Id.* at 402. Here, a juvenile petition was filed which conferred jurisdiction on the trial court, and jurisdiction continued "through all subsequent stages of the action," including the entry of the nonsecure custody order. *In re T.R.P.*, 360 N.C. at 593.

Accordingly, we conclude the trial court had jurisdiction to enter the nonsecure custody order placing the children into the custody of DSS, and thus, the agency had standing to file the motion to terminate respondents' parental rights. The trial court had jurisdiction over the termination action.

*Best Interests Determination*

" 'If a trial court finds one or more grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), it then proceeds to the dispositional stage,' at which it

'determine[s] whether terminating the parent's rights is in the juvenile's best interest.' " *In re I.N.C.*, 374 N.C. 542, 546 (2020) (alteration in original) (first quoting *In re A.U.D.*, 373 N.C at 6; then quoting N.C.G.S. § 7B-1110(a)). In determining whether termination of parental rights is in the child's best interests,

> the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2019).

We first address respondents' argument concerning the appropriate standard of review for a disposition entered under N.C.G.S. § 7B-1110(a). Respondents acknowledge this Court's long-standing precedent that "[t]he trial court's assessment of a juvenile's best interests at the dispositional stage is reviewed solely for abuse of discretion." *In re A.U.D.*, 373 N.C. at 6 (citing *In re D.L.W.*, 368 N.C. 835, 842 (2016)); *see also In re Montgomery*, 311 N.C. 101, 110 (1984). However, they argue that "*Montgomery's* dispositional standard of review has been abrogated by statutory

changes and *A.U.D.* was incorrect to rely on it and its progeny for the standard of review" and advocate for a de novo standard of review. We recently considered similar arguments in *In re C.V.D.C.*, 374 N.C. 525 (2020), and as in that case, "we again reaffirm our application of the abuse of discretion standard when reviewing the trial court's determination of 'whether terminating the parent's rights is in the juvenile's best interest' under N.C.G.S. § 7B-1110(a)." *Id.* at 529; *see also In re Z.A.M.*, 374 N.C. 88, 99 (2020); *In re A.R.A.*, 373 N.C. 190, 199 (2019). "[A]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re A.U.D.*, 373 N.C. at 6–7 (alteration in original) (quoting *In re T.L.H.*, 368 N.C. 101, 107 (2015)). Given this standard of review, respondents' argument that each of the N.C.G.S. § 7B-1110(a) factors weighs against termination in this matter when reviewed under a de novo standard cannot prevail.

Respondents also argue that even under the abuse of discretion standard the termination order should be reversed. Under their abuse of discretion argument, they only challenge Finding of Fact 7, which provides that "[a]lthough there is not a potential adoptive placement identified at this time, it is likely that the children can be adopted[, and f]urthermore, more resources for recruiting potential adoptive families will be available after entry of an order terminating parental rights." Respondents contend that the trial court's finding that the children likely would be adopted is "manifestly unsupported by reason" because DSS was unable to find a

stable home for the children in the ten years between the adjudication and the termination hearing.

However, the trial court's finding is supported by the evidence. Both the social worker and the guardian ad litem recommended terminating respondents' parental rights and reported it was "likely that [Katie and Kennedy] can be adopted together" and "very likely [they can] be adopted once they have been legally free for adoption." At the disposition hearing, the social worker testified to potential adoptive placements, including one with a relative, and "absolutely" agreed that additional doors for recruiting potential adoptive homes would open upon the termination of respondents' parental rights. This evidence fully supports the challenged finding.

Respondents also rely on *In re J.A.O.*, 166 N.C. App. 222 (2004). However, the salient facts in that case are very different from the facts here. In *In re J.A.O.*, the juvenile's mother "had made reasonable progress to correct the conditions that led to the petition to terminate her parental rights." *Id.* at 224. At the termination hearing, the guardian ad litem opined that it was in the juvenile's best interests not to terminate the respondent's parental rights. *Id.* at 225. The guardian ad litem testified that it was "highly unlikely that a child of [the juvenile's] age and physical and mental condition would be a candidate for adoption, much less selected by an adoptive family." *Id.* at 228. The Court of Appeals stated that although there was a small possibility that the juvenile would be adopted, the "remote chance of adoption in this case" did not "justif[y] the momentous step of terminating respondent's parental

rights." *Id.* This is distinguishable from the current matter, where the guardian ad litem and social worker both recommended termination and provided that adoption was likely, or even very likely, and the social worker testified to potential adoptive placements.

A careful review of the trial court's dispositional findings shows that the trial court considered all of the relevant statutory criteria set out in N.C.G.S. § 7B-1110(a). The record establishes that the trial court's conclusion that termination of respondents' parental rights was in Katie's and Kennedy's best interests was neither arbitrary nor manifestly unsupported by reason. For the reasons stated above, we affirm the 12 September 2019 order of the trial court terminating respondents' parental rights.

AFFIRMED.