IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-42

No. 534A20

Filed 18 March 2022

IN THE MATTER OF: S.M.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) (2019) from the order entered on 22 September 2020 by Judge Doretta L. Walker in District Court, Durham County. This matter was calendared in the Supreme Court on 18 February 2022 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*The Law Office of Derrick J. Hensley, PLLC, by Derrick J. Hensley, for petitioner-appellee Durham County Department of Social Services.*

*Brendan A. Bailey and Ashley A. Edwards for Guardian ad Litem.*

*Kathleen M. Joyce for respondent-appellant mother.*

*Benjamin J. Kull for respondent-appellant father.*

EARLS, Justice.

Respondents appeal from the trial court's order terminating their parental rights to S.M. (Sarah).[1] Respondents assert that the trial court erred in concluding it was in Sarah's best interests to terminate their parental rights. After careful review, we affirm the trial court's order.

---

[1] Pseudonyms are used in this opinion to protect the juvenile's identity and for ease of reading.

## I. Background

On 25 May 2017, Durham County Department of Social Services (DSS) filed a juvenile petition alleging that Sarah, age eight at the time, was neglected. The petition alleged that respondent-father asked Sarah's older half-sister, Ginny, to bathe him, despite being fully capable of bathing himself. The petition further alleged respondent-father had inappropriate sexualized discussions with Ginny, had engaged in "grooming" behaviors with Ginny, and had inappropriately disciplined both Ginny and Sarah by pinching their buttocks. The petition also noted respondent-father's previous sex offense convictions for acts against his two oldest daughters, who were now adults.

Respondents agreed to place Sarah in an approved kinship placement. Between May and November, Sarah moved placements three times. The safety placements reported that Sarah displayed inappropriate sexualized behavior and language. In November 2017, Sarah's final kinship placement informed DSS that she could no longer remain in the home. DSS filed a subsequent petition on 28 November 2017, alleging Sarah to be neglected and dependent. Due to the lack of a safety placement, DSS was granted nonsecure custody of Sarah.

On 15 December 2017, Sarah was adjudicated neglected and dependent. The trial court found she was subjected to inappropriate discipline and exposed to domestic violence in the home; respondent-father "refused to adhere to normal

interpersonal boundaries" with Sarah and Ginny; and respondent-mother failed to protect Sarah. The court placed Sarah in the legal custody of DSS.

¶ 5    Following a permanency planning hearing, the trial court entered an order on 6 February 2019 setting Sarah's permanent plan as reunification with an alternative plan of guardianship with a court-approved caretaker. The trial court cited respondents' failure to acknowledge or remediate the issues that led to Sarah's removal. In a subsequent permanency planning order entered in July 2019, the trial court noted respondents' continued lack of progress and changed Sarah's permanent plan to adoption with alternative plans of guardianship and reunification. Following a permanency planning hearing on 14 October 2019, the court relieved DSS from further reunification efforts and removed reunification as an alternative permanent plan based on respondents' continued failure to engage in services or acknowledge the issues that caused Sarah to be removed from the home.

¶ 6    On 15 October 2019, DSS filed a motion to terminate respondents' parental rights on the grounds of neglect and willfully leaving Sarah in foster care for more than twelve months without a showing of reasonable progress to correct the conditions that led to Sarah's removal. *See* N.C.G.S. § 7B-1111(a)(1)–(2) (2019).

¶ 7    Following a hearing on 26 and 30 June 2020, the trial court entered an order on 22 September 2020, concluding that grounds existed to terminate respondents' parental rights in Sarah pursuant to N.C.G.S. § 7B-1111(a)(1) and (2). The court also

concluded it was in Sarah's best interests that respondents' parental rights be terminated. Respondents appealed.

## II. Analysis

Our Juvenile Code provides for a two-stage process for the termination of parental rights—an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of one or more grounds for termination under N.C.G.S. § 7B-1111(a). N.C.G.S. § 7B-1109(f) (2019). Here, the trial court determined there was sufficient evidence to terminate respondents' parental rights pursuant to N.C.G.S. § 7B-1111(a)(1) and (2), and neither respondent has challenged this portion of the trial court's ruling. Accordingly, we consider only the dispositional portion of the trial court's order.

At the dispositional hearing, "the court shall determine whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a) (2019).

> The court may consider any evidence, including hearsay evidence as defined in G.S. 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile. In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.

(4) The bond between the juvenile and the parent.

(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6) Any relevant consideration.

*Id.* "Although the trial court must consider each of the factors in N.C.G.S. § 7B-1110(a), written findings of fact are required only 'if there is conflicting evidence concerning the factor, such that it is placed in issue by virtue of the evidence presented before the district court.' " *In re G.G.M.*, 377 N.C. 29, 2021-NCSC-25, ¶22 (quoting *In re A.R.A.*, 373 N.C. 190, 199 (2019)).

" 'The trial court's dispositional findings are binding . . . if they are supported by any competent evidence' or if not specifically contested on appeal." *In re B.E.*, 375 N.C. 730, 745 (2020) (quoting *In re E.F.*, 375 N.C. 88, 91 (2020)). The trial court's assessment of a juvenile's best interests is reviewed solely for abuse of discretion. *In re D.L.W.*, 368 N.C. 835, 842 (2016) (citing *In re L.M.T.*, 367 N.C. 165, 171 (2013); *see also In re Montgomery*, 311 N.C. 101, 110 (1984)). "Under this standard, we defer to the trial court's decision unless it is manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision." *In re J.J.B.*, 374 N.C. 787, 791 (2020) (cleaned up).

Here, respondents argue that there was insufficient evidence to support many of the trial court's dispositional findings and that the court abused its discretion when

it determined that termination of their parental rights was in Sarah's best interests.

¶ 12    The trial court made the following findings of fact regarding the statutory

criteria set forth in N.C.G.S. § 7B-1110(a):

> 82. The Court accepted into evidence the DSS court summary dispositional report, addendum, a letter from the child's psychiatrist, and the [guardian ad litem's] dispositional report.
>
> 83. [Sarah] is eleven years old . . . .
>
> 84. [Sarah] has been in Durham DSS custody for over two years.
>
> 85. The permanent plan for the child is adoption and termination of the parental rights of [respondents] will aid in the accomplishment of the permanent plan for the child.
>
> 86. Although [Sarah] is older and has behavioral challenges, she has also displayed the ability to bond and connect with her caretaker and has shown consistency in the last ten months with her current care provider. During that ten months, there has been no physical aggression against the caregiver, and supportive services have helped her find stability and reduce the number of revenge bouts she has at school. Her therapist has also identified the child's connections to her parents as holding her back from being able to develop. The child is continuing to receive mental health assistance and there is a likelihood that she could be adopted.
>
> 87. [Sarah] has shown the ability to bond with her current caretaker, who she has lived with for the last eight months. Her behaviors have dramatically improved and she has even asked if she could call the caretaker "Mom." While [Sarah] is not in a pre-adoptive placement, her current caretaker has committed to helping [Sarah] transfer to her forever home. [Sarah] approaches the caregiver for

affection, seeks affirmations from her, and shows a desire to please her.

88. The foster parent has expressed that she is very fond of [Sarah] and sees potential in her. [Sarah] has communicated to the social worker that she enjoys time on the farm with the current foster parent and the foster parent's extended family who live beside the farm. During [Sarah's] time in the current placement, she has begun to open up regarding her anger and responsiveness to others when upset being what she has seen growing up. [Sarah] has been responsive to the structure and consistency provided in the current home and seems somewhat trusting of the caregiver to discuss her feelings and act accordingly when redirected.

89. There is no denying that [Sarah] loves her parents and that her parents love [Sarah]. There are concerns about the parents' manipulation of [Sarah] in their feedback with her.

90. [Sarah] has an undeniable bond with her mother and father, as she has maintained a sense of loyalty to them since coming into care. Often times children who have experienced some form of trauma, feel a sense of loyalty as the control of the offender is all they know. This control has convinced them that the offender has their best interest at heart therefore making it easier for the offender to manipulate their actions and emotions. [Sarah's] experience with trauma is no different, being exposed to sexually inappropriate boundaries, inappropriate discipline, and grooming behaviors have somehow given her a sense of trust and normalcy in the home of her biological parents, thus creating negative attachments that are not conducive to her over all well-being and safety. [Sarah's] psychiatrist has expressed concern due to [Sarah's] emotional immaturity that she is more vulnerable and at risk for further mental health instability if she is not provided the opportunity to properly receive mental health treatment in a neutral setting. [Sarah]

continues to demonstrate a level of guilt around the bond with her parents.

91. [Sarah's] bond with her parents inhibits her ability to trust. Trust issues have carried through the past behavior issues and prior 18 placements over the last three years.

92. [Sarah] desired to cut her hair and after months of refusal of her parents, she cut her hair herself. After receiving negative feedback from the parents regarding why she would cut her hair, [Sarah] reverted to stating that she changed her mind and no longer desired to cut her "locs" out because she did not want to upset her parents. She changed her decision after talking to her parents because she feared upsetting her parents, which shows guilt and loyalty.

93. [Sarah's] inability to work through her own trauma is a repetition of her guilt issues with her parents.

94. [Sarah] demonstrates a hesitancy to discuss her trauma or any event that occurred in her biological family's home prior to coming into care, stating "we don't talk about family business." Although the parent's support of [Sarah] seems appropriate in their communication to her, as they often encourage her to do her best and that she can become anything she desires when she grows up, the result ends with the parents discussing points of the case in how [Sarah's] current circumstance is not her fault but merely her response to all of the stress and trauma that the "system" and DSS has pressed upon her by placing her in foster care. This is a clear deflection of accountability of the parent's actions and that of [Sarah] over her negative behaviors. Although [Sarah] may have a bond with her parents, this bond is not healthy and hinders [Sarah's] ability to work through her trauma and grow into a healthy young adult.

To the extent respondents do not except to these findings, they are binding. *In re B.E.*,

375 N.C. at 745.

¶ 13     We begin by addressing respondent-father's exception to the statement in finding of fact 82 that the letter accepted into evidence at the dispositional hearing was prepared by Sarah's "psychiatrist"—which he contends "is simply not true." We agree with respondent-father that the only letter admitted into evidence for disposition was from Morrow Dowdle, a physician's assistant at Carolina Behavioral Health, who made clear in her letter that "my role in treating [Sarah] is limited to psychiatric medication management, and I do not claim to be a trained psychotherapist[.]" However, we conclude the trial court's mischaracterization of the letter's source is harmless. *See generally In re N.C.E.*, 379 N.C. 283, 2021-NCSC-141, ¶22 (applying harmless error standard to dispositional findings). Ms. Dowdle's letter states that Sarah had been her "patient" since 18 November 2019, and she was familiar with Sarah's "history, physical, and mental status examination" in addition to her psychiatric diagnoses and medications. Ms. Dowdle's observations and opinions about Sarah were based on "[her] own interactions with [Sarah,] and reports by her foster parent and social worker" and are consistent with those of Sarah's psychiatrist and therapist, as described in DSS's written report to the court, as well as those of Sarah's guardian ad litem (GAL) and DSS social worker.

¶ 14     Respondent-mother challenges findings of fact 85–94, claiming they are based on "conjecture and erroneous, incomplete, misleading, and contradictory statements,

and thus are not competent evidence to support the trial court's best interest determination." She argues the trial court abused its discretion in terminating her parental rights "when there was no plan for Sarah's adoption and serious obstacles existed to her successful placement." Respondent-father also challenges portions of these findings. He further argues that the only dispositional factor in N.C.G.S. § 7B-1110(a) weighing in favor of termination was the parent-child bond, and that the trial court therefore abused its discretion in determining it was in Sarah's best interests to terminate his rights. We consider each parent's evidentiary arguments in the context of the relevant statutory factor.

## A. Age of the juvenile

Neither respondent challenges the trial court's finding that Sarah was eleven years old at the time of the termination hearing, but they both contend that Sarah's age should have weighed against terminating their parental rights. Respondent-mother argues Sarah's age was a possible barrier to adoption. Respondent-father adds that, because Sarah was nearly twelve at the time of the termination hearing and had expressed a preference against adoption, "the trial court knew that Sarah's age weighed against her likelihood of adoption." In her reply brief, respondent-mother adopts respondent-father's argument that the trial court's failure to consider Sarah's feelings on the matter of adoption amounts to an abuse of discretion. We disagree.

As a general matter, our adoption statutes require a child's consent to an

adoption if she is at least twelve years of age. N.C.G.S. § 48-3-601(a)(1) (2019). Under N.C.G.S. § 48-3-603(b)(2) (2019), however, the trial court may waive this consent requirement "upon a finding that it is not in the best interest of the minor to require the consent." *In re C.B.*, 375 N.C. 556, 562 (2020) (quoting *In re M.A.*, 374 N.C. 865, 880 (2020)).

¶ 17 Here, the trial court sustained DSS's objection on relevance grounds when counsel for respondent-mother asked the social worker whether DSS would consider Sarah's feelings on adoption when she turned twelve. The court ruled the question irrelevant because "[w]hen [Sarah] turns twelve, this case will be over." Presuming, arguendo, that the court should have permitted this line of inquiry, we conclude the ruling was harmless inasmuch as Sarah's potential objection "would not preclude [her] adoption." *In re M.A.*, 374 N.C. at 880.

**B. Likelihood of adoption and whether termination will aid in the accomplishment of the permanent plan**

¶ 18 Respondents raise several challenges to findings of fact 85–88 that combine arguments related to Sarah's likelihood of adoption with those disputing the trial court's finding that terminating their parental rights will aid in the accomplishment of her permanent plan. *See* N.C.G.S. § 7B-1110(a)(2), (3). We consider these arguments together.

¶ 19 Respondent-mother challenges finding of fact 85 on the ground that the evidence at the termination hearing "failed to show how the drastic step of severing

the parental bond actually aided in accomplishing [Sarah's] adoption." She asserts that terminating her parental rights will bring Sarah no closer to a "forever home" given the continued mental health supports Sarah would need. Respondent-mother contends adoption would complicate the stability Sarah has found in her current foster home, noting the lack of evidence on the effect that severing the bond with her current foster mother would have on Sarah. Respondent-mother also points to the absence of evidence of an identified adoptive placement for Sarah, DSS's efforts to locate such a placement, and the possible barriers to adoption such as Sarah's age and behavioral problems.

¶ 20    While respondent-father does not expressly challenge the evidentiary support for finding of fact 85, he contends the finding fails to take account of Sarah's concurrent permanent plan of guardianship which, unlike adoption, would not require the termination of his parental rights. Respondent-mother also alludes to the trial court's failure to consider guardianship as an alternative to termination.

¶ 21    "Unquestionably, the termination of respondent[s'] parental rights was a necessary precondition of [the child's] adoption." *In re E.F.*, 375 N.C. 88, 93 (2020). Moreover, competent evidence supports the trial court's finding that termination would aid in accomplishing the permanent plan. The record confirms that adoption was Sarah's primary plan, and guardianship was the secondary plan. The GAL advised the court that Sarah's permanent plan had been "changed to [a]doption" on

10 July 2019. DSS's dispositional report also states that "[t]he permanent plan for the child currently is adoption with a secondary plan of guardianship[,]" and that "[t]ermination of parental rights will aid in the accomplishment of adoption/guardianship for the child." At the termination hearing, DSS social worker Tamika Jenkins testified that Sarah's permanent plan was adoption and that terminating respondents' parental rights would aid in realizing the plan.

¶ 22        Respondent-father offers no authority for his assertion that N.C.G.S. § 7B-1110(a)(3) requires the trial court's order to address the secondary plan. Nor does he point to any conflicting evidence about whether terminating his parental rights would aid in achieving a guardianship for Sarah, such that written findings would have been required. *See In re G.G.M.*, 2021-NCSC-25 at ¶22.

¶ 23        We further find no evidence tending to show that it was in Sarah's best interests to appoint a guardian for her while leaving respondents' parental rights intact. The trial court established a primary permanent plan of adoption based on respondents' failure to acknowledge and remedy the issues that led to Sarah's removal from their home. Respondent-father argued at the hearing that the alternate permanent plan of guardianship without a termination of parental rights would allow respondents to "continue to be a positive influence on [Sarah's] life." However, the evidence showed that, despite the love Sarah and respondents had for each other, respondents were not a positive influence in her life, and adoption rather than

guardianship was in her best interests. *See In re J.J.B.*, 374 N.C. 787, 795–96 (2020) (rejecting respondent-parents' argument that, "given the strong bond between themselves and [their children], the trial court should have considered other dispositional alternatives, such as guardianship").

¶ 24        Respondent-mother next challenges the portion of finding of fact 86 stating "there has been no physical aggression against [Sarah's] caregiver" during the ten months that preceded the 26 June 2020 termination hearing. We agree with respondent-mother that this finding is inconsistent with the evidence presented at the hearing and included in the record on appeal. The evidence showed Sarah had been in her current foster placement for ten months at the time of the hearing and had exhibited no physical aggression toward her foster mother since an incident on 4 October 2019—a period of almost nine months.[2] Accordingly, we disregard the extra month included in this finding for purposes of our review. *See In re J.M.J.-J.*, 374 N.C. 553, 559 (2020).

¶ 25        Respondent-mother also challenges the trial court's finding of a "likelihood that [Sarah] could be adopted" in finding of fact 86. Respondent-father does not deny the evidentiary support for the finding, but he characterizes the court's assessment of Sarah's adoptability as "[nothing] more than a mere hypothetical possibility" given

_____

[2] Likewise, the DSS disposition report dated 17 June 2020 states that "[i]n the last six months [Sarah] has maintained behavioral stability with the caregiver, as no new incidents have been reported of physical aggression against the caregiver."

Sarah's behavioral problems.

¶ 26        The finding that Sarah is likely to be adopted is supported by competent evidence. Ms. Jenkins attested to the likelihood of Sarah being adopted if she was provided continued stability and support, Ms. Jenkins acknowledged Sarah's struggles with behavioral issues, including an aggressive incident with her current foster mother, but noted improvements—mostly at home but also in school—as her living situation and mental health providers stabilized in the months leading up to the termination hearing. Ms. Jenkins also described Sarah's bond with her foster mother and how Sarah was opening up and seeking affection, something she had not done in her earlier placements. The written reports submitted by DSS and GAL also acknowledged Sarah's misbehaviors but noted they had improved during Sarah's placement with her current foster mother, with whom she had formed a positive and trusting attachment. *See generally In re M.A.*, 374 N.C. at 880 ("[T]he trial court's findings concerning the ability of the children to bond with their current caregivers did tend to support a conclusion that the children were adoptable given their ability to develop a bond with other human beings."). The foster mother expressed a willingness to serve as a "bridge" caretaker for Sarah until a pre-adoptive placement was identified. Moreover, the hearing testimony tended to show Sarah would receive additional resources for finding an adoptive placement once she was free for adoption. Therefore, it was within the trial court's discretion to view Sarah's likelihood of

adoption as a fact favoring the termination of respondents' parental rights. *See In re N.C.E.*, 379 N.C. 283, 2021-NCSC-141 ¶30 (explaining that "it is left to the trial court's discretion to weigh the various competing factors in N.C.G.S. § 7B-1110(a) in arriving at its determination of the child's best interests").

¶ 27     Respondent-mother characterizes finding of fact 87 as "incomplete and misleading" in depicting Sarah's improved behavior in the months leading up to the termination hearing. She contends the finding "downplays the seriousness of Sarah's behavioral problems and does not account for the effect of the [COVID-19] pandemic, which . . . limited her contact with others." We find no merit to this claim. The trial court acknowledged Sarah's ongoing "behavioral challenges" in finding of fact 86. Finding 87 in no way suggests an end to these issues and is fully supported by Ms. Jenkins's testimony and the information found in the DSS and GAL's reports. Respondent-mother's conjecture about the effect of the pandemic on Sarah's behavior provides no basis to overturn the court's otherwise-supported finding.

¶ 28     Respondent-mother objects to finding of fact 87 because it states approvingly that Sarah "shows a desire to please her" foster mother, while subsequent findings describe Sarah's ongoing desire to please respondents as indicative of unresolved "guilt issues with her parents." What respondent-mother casts as an unexplained "contradiction" in the trial court's findings, we find to be a clear distinction drawn by the court between Sarah's newfound responsiveness to the care and nurturing she

has received from her foster mother and the lingering effects of the manipulative, controlling relationship respondents cultivated with their daughter. We thus find no merit to respondent-mother's objections to finding of fact 87.

¶ 29 Respondent-mother next contends the account of Sarah's relationship with her current foster mother in finding of fact 88 "is not supported by competent evidence" to the extent it states Sarah "has begun to open up regarding her anger and responsiveness to others when upset *being what she has seen growing up*." (Emphasis added). We agree with respondent-mother that the italicized portion of this finding is unintelligible, likely resulting from a scrivener's error. Therefore, we disregard this portion of finding of fact 88. However, the remainder of this finding is supported by Ms. Jenkins's testimony and the written reports submitted by DSS and the GAL.

¶ 30 We find no merit to respondent-mother's argument that the DSS report does not constitute competent evidence because it "does not identify the sources for this information or provide any details to determine its reliability within the meaning of N.C.G.S. § 7B-1110(a)." *See In re R.D.*, 376 N.C. 244, 251 (2020) (concluding the GAL's report summarizing multiple interviews was properly admitted for dispositional purposes under N.C.G.S. § 7B-1110(a) even though neither the GAL nor the interviewees testified at the hearing). Respondents allowed the dispositional reports into evidence without objection and were free to cross-examine Ms. Jenkins, who signed the report, about her observations and sources.

¶ 31        In a footnote to his brief, respondent-father suggests that finding of fact 87 "overstates the level of commitment" shown by Sarah's foster mother to continue caring for Sarah until a pre-adoptive home is located. He takes issue with the trial court's statement that the foster mother "has committed to helping Sarah transfer to her forever home," when the DSS report says only that she "expressed a willingness to be a bridge caregiver for Sarah until a preadoptive placement can be identified." We find respondent-father's parsing of the trial court's language wholly unpersuasive. To the extent he contests the evidentiary basis for finding 87, we conclude competent evidence supports the finding.

### C. The bond between the juvenile and the parents

¶ 32        Respondent-father claims "[t]here was no evidence that Sarah's therapist believes Sarah's relationship with her parents is 'holding her back' " as stated in finding of fact 86. We agree with respondent-father that the trial court appears to have wrongly attributed this opinion to Sarah's therapist. The evidence shows Sarah's psychiatrist, the GAL, and Ms. Dowdle shared the belief that Sarah's relationship with her parents was hindering her development. However, nothing in the record indicates that Sarah's therapist also voiced this opinion. Nevertheless, we conclude the trial court's misattribution was harmless, given that two of Sarah's mental health treatment providers and her GAL did express this view.

¶ 33        We further find no merit to respondent-father's suggestion that Ms. Dowdle's

letter was the sole "evidentiary basis" for this portion of finding of fact 86. The opinions of Sarah's GAL and psychiatrist were conveyed in the written reports submitted to the court. Equally unfounded is respondent-father's speculation that the references to Sarah's psychiatrist in the DSS report were actually "mistaken reference[s] to the physician's assistant[,]" Ms. Dowdle. *See generally State v. Daughtry*, 340 N.C. 488, 517 (1995) ("We will not assume error 'when none appears on the record.' " (quoting *State v. Williams*, 274 N.C. 328, 333 (1968))). The fact that DSS conveyed the opinion of Sarah's psychiatrist in its written report—rather than obtaining a letter from the psychiatrist like the one provided by Ms. Dowdle—does not render the report unreliable for purposes of N.C.G.S. § 7B-1110(a). *See In re R.D.*, 376 N.C. at 251 (recognizing "the trial court possessed the discretion to determine that the [GAL's] report was, in fact, 'relevant, reliable, and necessary' to determine the best interests of [juvenile]" (quoting N.C.G.S. § 7B-1110(a))).

¶ 34　　　　Both respondent-mother and respondent-father take exception to the trial court's description of their bond with Sarah in findings of fact 89 and 90. They specifically challenge the evidentiary support for the trial court's findings that "there 'are concerns about the parents' manipulation of [Sarah] in their feedback with her[,]' " that Sarah's bond with respondents reflects "negative attachments that are not conducive to her overall well-being and safety[,]"and that Sarah's "experience with trauma" is similar to other traumatized children and has left her with an

unhealthy sense of loyalty toward her "offender[s,]" i.e., respondents.

¶ 35 Respondent-mother also asserts the remaining statements about the parent-child bond in findings of fact 91 through 94 are unsupported by the evidence and based on psychological speculation. She argues "no trained psychologist or psychiatrist testified or submitted direct evidence in the case" and, therefore, there is no competent evidence to support the court's findings that (1) the parent-child bond inhibits Sarah's ability to trust; (2) Sarah changing her decision to cut her hair exhibited "guilt and loyalty" toward respondents; (3) Sarah's "inability to work through her own trauma is a repetition of her guilt issues" with respondents; and (4) respondents' "deflection of accountability" of their actions and Sarah's behavior "is not healthy and hinders [Sarah's] ability to work through her trauma and grow into a healthy young adult."

¶ 36 Respondent-father objects to finding of fact 90 on the ground that it "includes expert opinion" which the DSS social worker was not qualified to offer. He raises a similar challenge to the statement in finding of fact 91 that Sarah's "bond with her parents inhibits her ability to trust[,]" claiming the GAL who asserted as much in her written report was not qualified to render this opinion. More generally, respondent-father contends there was no evidence Sarah suffered from guilt arising from her bond with her parents as stated in findings of fact 90, 92, and 93.

¶ 37 Respondent-father also challenges the statement in finding of fact 94 that the

parent-child "bond is not healthy and hinders [Sarah's] ability to work through her trauma and grow into a healthy young adult." He reiterates the position he raised in disputing finding 86 that the only the evidence for this finding was the letter written by Ms. Dowdle, the contents of which he believes were mischaracterized in the DSS report as the opinions of a psychiatrist. To the extent the DSS report conveyed the opinions of an unidentified psychiatrist rather than Ms. Dowdle, respondent-father contends this evidence amounts to "unreliable double hearsay."

¶ 38    Finally, respondents take issue with Ms. Jenkins's and the trial court's characterization of "[t]he hair-cutting incident" described in finding of fact 92. Ms. Jenkins cited this episode as an example of respondents' unhealthy manipulation of Sarah and her resulting feelings of guilt. Respondents insist it merely showed that they opposed Sarah's desire to change her hairstyle and expressed disapproval when she disregarded their wishes and cut her hair—what respondent-father deems "a mundane example of everyday parenting." Respondents also reiterate the argument raised by respondent-mother in her challenge to finding of fact 87, that the trial court portrayed Sarah's "desire to please her foster mother . . . [a]s positive" while treating her "desire to please her natural parents . . . as unhealthy[.]"

¶ 39    In their numerous challenges to the trial court's findings about the parent-child bond under N.C.G.S. § 7B-1110(a)(4), respondents tacitly acknowledge the court's findings are consistent with Ms. Jenkins's hearing testimony, the contents of

the reports prepared by DSS and the GAL, and the statements in Ms. Dowdle's letter. Despite respondents' strenuous arguments to the contrary, we conclude the findings are supported by some relevant and reliable evidence and are thus binding on appeal. *See In re B.E.*, 375 N.C. at 745.[3]

In her testimony for purposes of adjudication, Ms. Jenkins expressed concern about respondents' "negatively communicating to [Sarah]" at visitations. While encouraging Sarah to do better in school and in managing her behavior, respondent-father emphasized to Sarah that her behaviors were not her fault, and that DSS or "the system" was the cause of the family's problems. Respondent-father testified he always instructed Sarah not to trust strangers, including "anyone she has not been affiliated with or had been introduced solely from her parents to her"—although he denied telling Sarah not to trust DSS.

At disposition, Ms. Jenkins further attested to respondents instilling in Sarah an us-versus-them worldview, such that her cooperation with DSS or openness to others represented to Sarah a betrayal of her parents. Ms. Jenkins explained that Sarah's feelings of loyalty to respondents impeded her ability to develop relationships with others, as follows:

> [Sarah] has this mind set that, you know, "My family's business is my business. I can't get close to anyone. I

---

[3] As noted in our discussion to follow, pursuant to N.C.G.S. §7B-1110(a), a trial court may "consider any evidence, including hearsay evidence . . . that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile."

shouldn't open up to let them get close to me." Our concern is her ability to be able to live a normal life open up and trust others and embrace peers, embrace friends, embrace those that are here, in addition to her parents and her history with her parents . . . .

. . . I've seen this child begin to open up and, you know, seek nurturing, seek affirmations from caregivers, open up to even talk to me about some trainings that she has asked me not to tell her parents. And for [Sarah] that's big. She doesn't trust very easily. And so our concern is her being able to build on that. The — I don't want to say fear, but the continued concern of hers about what her parents think, and what are they going to say, I think hinders her from growing, hinders her from being open to be receptive to be loved. . . .

In her letter, Ms. Dowdle likewise expressed a belief that Sarah "will not be able to appropriately verbalize and process her trauma as long as she continues to interact with [respondents] . . . as she is likely to experience feelings of guilt and loyalty that are typical for a child of her age and circumstances, but are likely to hinder her progress."

¶ 42     The written reports submitted by DSS and the GAL include similar observations and opinions from Ms. Jenkins, the GAL, and Sarah's psychiatrist. Ms. Jenkins, who signed the DSS report, wrote that Sarah's exposure to traumatic experiences in the home, including "sexual inappropriate boundaries, inappropriate discipline, and grooming behaviors," led her to form "negative attachments [to respondents] that are not conducive to her overall well-being and safety." Her report describes Sarah as "continu[ing] to demonstrate a level of guilt around the bond with

her parents." The GAL suggested that Sarah "may be resistant to the idea of adoption due to her sense of loyalty to her parents," which "has hindered her willingness to open up and trust others," as well as her "lack of understanding as to why she is in foster care[.]" Sarah's psychiatrist expressed "concern regarding [Sarah's] ability to fully process the idea of adoption and move forward with the chapter in her life, [due] to a fear of making a decision against her parents." The psychiatrist "conclude[d] that although [Sarah] may have a bond with her parents, this bond is not healthy and hinders [her] ability to work through her trauma and grow into a healthy young adult."

¶ 43        Findings of fact 89–94 are thus consistent with the evidence received by the trial court regarding Sarah's bond with respondents and the negative impact of the relationship on Sarah's emotional development and well-being. The evidence provides ample basis for the trial court's findings that Sarah continued to experience guilt arising from a distorted sense of loyalty to respondents, who refused to acknowledge the injurious environment they created for Sarah while she was in their care. The evidence also demonstrates the distinction between Sarah's unhealthy tendency to avoid upsetting respondents and her growing openness to and desire to please her foster mother, who "provides [Sarah] with a safe, nurturing, and structured loving and structured home environment."

¶ 44        As respondents did not object to the trial court's consideration of DSS's and the

GAL's written reports for purposes of disposition, their current arguments regarding the sourcing or overall reliability of these reports are not properly before us. *See* N.C. R. App. P. 10(a)(1). As previously noted, the dispositional statute expressly permits the trial court to "consider any evidence, *including hearsay evidence . . .* , that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile." N.C.G.S. § 7B-1110(a) (emphasis added). The trial court thus had the discretion to rely on the information contained in these reports—including the opinions of Sarah's DSS social worker and GAL, as well as those offered by Sarah's psychiatrist and therapist. *See In re R.D.*, 376 N.C. at 251 (concluding the GAL's report containing summaries of witness interviews, an analysis of the juvenile's needs, and the GAL's opinion that termination was in the juvenile's best interests was "directly related to the trial court's task during the dispositional stage" and was properly considered to "aid the trial court in determining the juvenile's best interests").

¶ 45   Ms. Jenkins's testimony also supports the account of Sarah's decision to cut her hair contained in finding of fact 92. Ms. Jenkins recalled Sarah expressing her intention to remove the locs from her hair "for weeks" to both Ms. Jenkins and her foster mother. Sarah was told respondents did not want her hair cut, but she proceeded to cut some of her locs out anyway, telling Ms. Jenkins that she did not want to have locs anymore. After a visit where respondents told Sarah that she would

be "bald-headed" if she cut her locs, she became "very upset" at respondents' reaction, changed her mind, and said she would keep her locs. Ms. Jenkins saw this episode as an example of Sarah setting aside her own wishes in order to avoid upsetting respondents. Although respondents may disagree with Ms. Jenkins's view of this episode, we decline to second-guess the trial court's decision to credit the social worker's perspective, given her familiarity with the family and their interpersonal dynamics. *See generally In re T.N.H.*, 372 N.C. 403, 411 (2019) ("[I]t is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn from the testimony.").

¶ 46      Aside from the trial court's mistaken attribution of an opinion to Sarah's therapist in finding of fact 86, we conclude that competent evidence supports each of the findings about the parent-child bond challenged by respondents—specifically findings of fact 89–94. We further note that, in addition to the contested findings, the court made additional findings about the injurious environment respondents created in their home that led to Sarah's adjudication as neglected, as well as respondents' persistent refusal to acknowledge a problem requiring any changes if Sarah were returned to their care. The court also made findings on the unreliability of respondent-father's testimony and his lack of credibility at the hearing. Each of these findings tends to show the deleterious nature of respondents' bond with Sarah.

**D. The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent plan**

¶ 47   Respondent-father emphasizes that the trial court's findings about Sarah's bond with her current foster mother do not speak to the dispositional factor in N.C.G.S. § 7B-1110(a)(5) because the placement was not expected to be permanent. However, as the court explained at the hearing, these findings were probative on the likelihood of Sarah's eventual adoption and were properly considered under N.C.G.S. § 7B-1110(a)(2). *See In re M.A.*, 374 N.C. at 880.

**E.  Determination of Sarah's best interests**

¶ 48   Respondent-mother argues the trial court abused its discretion under N.C.G.S. § 7B-1110(a) in terminating her parental rights "when there was no plan for Sarah's adoption and serious obstacles existed to her successful placement." Respondent-father also objects to the trial court's "decision that turns Sarah into a legal orphan[.]" Though he acknowledges it is not this Court's prerogative to reweigh the factors, respondent-father spends considerable time arguing that the weight of the factors does not support termination.[4]

---

[4] We find no merit to respondent-father assertion that "the General Assembly made a fundamental change" to the dispositional statute in 2005, "the magnitude [of which] cannot be overstated." According to respondent-father, "[b]efore the 2005 change, there existed in the Juvenile Code a preference in favor of terminating the parent-child relationship if the grounds to do so had been established[,]" and "[b]y explicitly removing that preference for termination, the General Assembly clearly indicated that it no longer believed such a preference was appropriate."

Prior to 2005, N.C.G.S. § 7B-1110 provided that, upon an adjudication of one or more grounds for terminating parental rights under N.C.G.S. § 7B-1111(a), "the court shall issue an order terminating the parental rights of such parent . . . unless the court shall further determine that the best interests of the juvenile require that the parental rights of the parent

Respondents also cite the risk that Sarah will not be adopted as demonstrating the trial court's abuse of its discretion. Respondent-father contends the court's "decision . . . turns Sarah into a legal orphan" much like the termination order reversed by our Court of Appeals in *In re J.A.O.*, 166 N.C. App. 222 (2004). Respondent-mother likewise emphasizes that "there was no plan for Sarah's adoption" at the time the trial court chose to terminate her parental rights.

We find the instant case readily distinguishable from *In re J.A.O.* The Court of Appeals found that J.A.O. was "a troubled teenager with a woefully insufficient support system" who had been shuffled through multiple treatment centers due to his significant physical, mental, and behavioral disorders. *Id.* at 227. His mother was "connected to and interested in" him, and she provided a stabilizing influence in his life. *Id.* at 227–28. She had also "made reasonable progress to correct the conditions

---

not be terminated." *In re Mitchell*, 148 N.C. App. 483, 492 (Hunter, J., dissenting in part) (quoting N.C.G.S. § 7B-1110(a) (1999)), *rev'd per curiam for reasons stated in dissenting opinion*, 356 N.C. 288 (2002). The General Assembly amended this language in 2005 to provide simply that, "[a]fter an adjudication that one or more grounds for terminating a parent's rights exist, the court shall determine whether terminating the parent's rights is in the juvenile's best interest." An Act to Amend the Juvenile Code to Expedite the Outcomes for Children and Families Involved in Welfare Cases and Appeals and to Limit the Appointment of Guardians ad Litem for Parents in Abuse, Neglect, and Dependency Proceedings, S.L. 2005-398, § 17, 2005 N.C. Sess. Laws 1455, 1463.

Contrary to respondent-father's contention, the pre-2005 language did not create a statutory "preference for termination." *See Mitchell*, 148 N.C. App. 483, 492–93 (Hunter, J., dissenting in part) (noting "there is no burden of proof at disposition" and rejecting the respondent's argument that the trial court improperly required him to prove that terminating his parental rights was not in the child's best interest (citation omitted)); *see also In re Blackburn*, 142 N.C. App. 607, 613 (2001) (concluding the statute created no presumption in favor of terminating parental rights).

that led to the petition to terminate her parental rights." *Id.* at 224. Under these circumstances and given the "remote chance" of sixteen-year-old J.A.O.'s adoption, the trial court was held to have abused its discretion by disregarding the recommendation of the GAL and terminating the mother's parental rights. *Id.*

¶ 51 Here, while Sarah had been in multiple placements due to her behavior, she had shown real improvement after finding stability in her current foster home, a factor that increased the likelihood of her adoption. Moreover, as discussed above, the evidence showed respondents refused to acknowledge that the reasons for Sarah's removal from their home were problems to be corrected, and made no progress towards correcting those conditions. Finally, rather than providing a stabilizing influence, Sarah's relationship with respondent-parents negatively affected her development.

¶ 52 To the extent respondents ask this Court to undertake our own assessment of the record evidence and to substitute our weighing of the relevant statutory criteria for that of the trial court, we decline to do so. "[S]uch an approach would be inconsistent with the applicable standard of review, which focuses upon whether the trial court's dispositional decision constitutes an abuse of discretion rather than upon the manner in which the reviewing court would weigh the evidence were it the finder of fact." *In re I.N.C.*, 374 N.C. 542, 551 (2020). A careful review of the dispositional findings shows the trial court considered all of the relevant statutory criteria in

N.C.G.S. § 7B-1110(a) and made a reasoned determination that termination of respondents' parental rights in Sarah would be in her best interests.

### III. Conclusion

The trial court's findings demonstrate that it considered the dispositional factors set forth in N.C.G.S. § 7B-1110(a) and "performed a reasoned analysis weighing those factors." *In re Z.A.M.*, 374 N.C. at 101. "Because the trial court made sufficient dispositional findings and performed the proper analysis of the dispositional factors," *id.*, we conclude that the trial court did not abuse its discretion in concluding that termination of respondents' parental rights was in Sarah's best interests. Accordingly, we affirm the trial court's order.

AFFIRMED.