An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-915

Filed 6 May 2026

Haywood County, Nos. 24JT001108-430, 24JT001109-430

IN THE MATTER OF: K.A.C. AND K.A.C.

Appeal by respondent-mother from orders entered 18 June 2025 by Judge Donna F. Forga in Haywood County District Court. Heard in the Court of Appeals 21 April 2026.

>   *Rachael J. Hawes, for petitioner-appellee Haywood County Department of Social Services.*
>
>   *Hooks Law, P.C., by Laura G. Hooks, for respondent-appellant mother.*
>
>   *Parker Poe Adams & Bernstein, LLP, by Cristina C. Stam, for guardian ad litem.*

FLOOD, Judge.

Respondent-Mother appeals from the trial court's orders terminating her parental rights to her minor children, K.A.C. ("Kim") and K.A.C. ("Kade").[1] On appeal, Mother argues the trial court abused its discretion by terminating her

---

[1] These pseudonyms have been agreed upon by the parties and are used to protect the identity of the juveniles in accordance with N.C. R. App. P. 42 (2025).

parental rights because Kim and Kade had strong bonds with her and were not in a pre-adoptive placement. After careful review, we conclude the trial court did not abuse its discretion, where there was evidence that there was a high likelihood the children would be adopted. As such, we affirm the trial court's orders terminating Mother's parental rights to Kim and Kade.

## I. **Factual and Procedural Background**

Mother and Father[2] are married and are the parents of Kim, born on 21 January 2015, and Kade, born on 30 June 2021.

Haywood County Health and Human Services Agency ("HCHHS") first became involved with the family in 2018 after receiving a report that Mother and Father engaged in a "fist fight while driving" the car with Kim in it, crashed the car into a guardrail, and left the scene. Two days after the car accident, a social worker met with Mother and Father to discuss these allegations. During their meeting, both parents "denied any domestic violence" issues. A few days later, however, Father informed the social worker that there had been one incident where he hit Mother because she had punched him in the eye when he was trying to stop her from stealing his car. Father also said the "typical argument" between him and Mother consisted of her "screaming at him and hitting him." When the social worker asked Mother about what Father had told her, Mother again denied there ever being any issues of

---

[2] The trial court also terminated Father's parental rights to Kim and Kade; however, Father does not appeal.

domestic violence between her and Father. HCHHS lost contact with the family after this initial conversation.

After several weeks of unsuccessful attempts to locate the family, HCHHS received a report alleging that Kim was alone outside the family's home on Red Fox Loop[3] while Father and Mother were inside fighting. According to the report, the fight started out verbal but ended with Father giving Mother "a bloody nose." When the social worker asked the family about these new allegations, both parents "denied ever living on Red Fox Loop," but Kim stated, "her parents were fighting and her mother hit her father, and then her father hit her mother in the face with his hand." Thereafter, HCHHS was unable to locate the family "for several months."

On 15 July 2019, HCHHS received a report alleging that Mother and Father were using methamphetamines while in Kim's presence. An investigation ensued, but both parents refused to comply with drug screens and failed to "seek any form of mental health or substance abuse treatment."

On 4 November 2020, HCHHS received another report alleging that Mother "smokes [m]ethamphetamines in the presence of [Kim] and drives drunk with the child in the car." When the social worker met with the family at their home to discuss these allegations, Mother denied "any substance abuse" and refused to comply with drug screens. During their meeting, the social worker noted there were no lights and

---

[3] The Record does not indicate in which city Red Fox Loop is located.

very minimal food was in the home.

Several weeks later, on 16 December 2020, HCHHS learned that Kim had missed eighteen days of school since October 2020. By 11 January 2021, Kim had missed twenty-four days of school. And by 16 April 2021, Kim had missed forty days of school, had thirty-four tardies, and was "very behind in school due to her excessive absences."

When Kade was born, in June 2021, he tested positive for "[m]ethamphetamines and [a]mphetamines[,]" and, due to respiratory issues, had to stay in the neonatal intensive care unit ("NICU") for approximately three weeks. A few days after Kade was discharged, HCHHS received reports indicating Mother had not brought Kade in for his NICU and newborn follow-up appointments and had not cooperated with referrals for Kade for home health services, Care Coordination for Children infant services, or the Child Development Services Agency. Mother admitted that she had not cooperated with the recommended home health services, but she denied all substance abuse.

Throughout 2021 and 2022, HCHHS received numerous reports concerning Mother's alleged substance abuse, Kim's absences from school, and Kade's missed doctor appointments. On 5 December 2022, HCHHS received a new report alleging that the home was "filthy[,] unsanitary," and "below minimum standards of care." According to the report, "[t]he trash had not been taken out in a year[, t]here were rats everywhere[,]" there were "dog feces throughout the home and on the deck[,]"

and there was no heat or electricity in the home. The following day, Social Worker Meredith Lund contacted the guidance counselor at Kim's elementary school and learned that Kim had not been to school in multiple weeks, Mother planned to homeschool Kim, and there was "an active arrest for []Mother due to [Kim]'s truancy from the prior school year." Later that same day, Social Worker Lund visited the family's home and found "a very large pile of trash to the side of the driveway" and "[t]he porch was covered in dog feces." She also saw a dog lying on the porch, but when she called for the dog, the dog did not respond. Once she got closer to the house, Social Worker Lund saw that the dog was dead. After further investigation, it was determined that the dog had died due to rat poisoning.

Social Worker Lund attempted to locate the family but was unsuccessful. Eventually, Social Worker Lund "had a CPS Alert generated as a 'BOLO' ["Be On the Lookout"] for this family."

On 8 December 2022, Social Worker Lund happened upon Mother's car at a house in Waynesville, North Carolina. Mother told Social Worker Lund that they had not been living in their other home for several weeks, but she had been going every other day to feed the dog. Mother admitted that, due to the rat infestation, she had put down rat poison to kill the rats, and "the dog had gotten inside and ingested the rat poison." The family informed Social Worker Lund that Father's boss owned the house in Waynesville and gave permission for the family to stay in the house while Father renovated it. The program manager subsequently contacted Father's boss to

verify this information, but Father's boss said that he had not given anyone permission to live in the home, and Father was supposed to finish remodeling the house by December 15 so that Father's boss could put it on the rental market. At 4:46 p.m. that same day, HCHHS took "12-Hour Custody" of Kim and Kade.

The next morning, HCHHS filed juvenile petitions alleging the minor children as abused, neglected, and dependent. The court granted HCHHS nonsecure custody of the children upon the filing of the petitions.

On 6 February 2023, the trial court entered a Consent Order on Adjudication, adjudicating Kim and Kade as neglected and dependent juveniles. In the order, the trial court approved HCHHS's request for a permanent plan of reunification, with a concurrent plan of legal guardianship with a relative or court-appointed caretaker. Additionally, the trial court ordered Mother to comply with her case plan and set visitation at a minimum of one hour per week, supervised.

The court held the first permanency planning hearing on 1 May 2023. The trial court found that, since the last court hearing, Mother "made minimal progress" on her case plan. Specifically, the trial court found Mother had obtained and maintained appropriate housing, but she did not show up for two of the scheduled drug tests, failed to complete parenting classes, was "not actively participating in or cooperating with the plan[,]" and "remained somewhat unavailable to the [c]ourt, [HCHHS], and the guardian ad litem."

After the second permanency planning hearing, held on 9 January 2024, the

trial court found that both parents "visit the juveniles consistently but are usually late to the visits." The trial court also found Mother had obtained a substance use assessment the day prior but had "not taken any classes or followed any recommendations of the assessment, due to just having completed it"; had submitted two drug screens since 8 December 2022, both of which were positive for methamphetamines; and was not making "adequate progress within a reasonable period of time under [her case] plan[.]"

The court held the third and final permanency planning hearing on 30 July 2024. By the time of the hearing, Kim and Kade had been in HCHHS's custody for nineteen months and had been in several foster placements. HCHHS requested Mother's compliance with nine drug screens throughout the first half of 2024, but of these requested drug screens, Mother only complied with one, which was positive for methamphetamines. And although Mother testified that "the 'assessor' was responsible for the drug screens showing positive results for [m]ethamphetamine[,]" the trial court found her testimony to be "uncredible and unreliable." Ultimately, the trial court determined Mother was not making adequate progress with her case plan within a reasonable time; was not cooperating with the plan, HCHHS, or the guardian ad litem; remained "somewhat unavailable to the [c]ourt, [HCHHS], and the guardian ad litem"; and was acting "in a manner inconsistent with the health or safety of the juveniles." Consequently, the trial court ceased reunification efforts and changed the permanent plan to adoption, with a concurrent plan of guardianship.

HCHHS filed petitions on 1 November 2024 to terminate Mother's parental rights. The termination proceeding was bifurcated, with the adjudication portion on 1 April and 25 April 2025 and the disposition portion on 20 May 2025.

At the adjudication hearing, the trial court heard testimony from Mother and Social Worker Nicole Hawthorne, who has been Kim and Kade's foster care social worker since they entered HCHHS's custody. Social Worker Hawthorne testified regarding the case history, the permanency planning hearings, and the filing of the petition. She testified that Kim was ten years old, "doing very well in her placement[,]" had bonded with the foster parents, but was frustrated "about being in foster care for over two years." Kade, then three years old, was also doing "very well" in his placement, had bonded to the foster parents, and, despite his respiratory issues as an infant, was healthy. Social Worker Hawthorne also testified that Mother continued to exercise her visitation rights but was late "[m]ore often than not[.]" The trial court ultimately found there were grounds to terminate Mother's parental rights and proceeded to the disposition hearing.

At the disposition hearing, Social Worker Hawthorne testified that, although the foster parents were not open to adopting Kim and Kade, the likelihood the children would be adopted is "very high." Social Worker Hawthorne elaborated further, explaining:

> [Kade] is a very cute, loveable kid. He has made great
> strides developmentally in the last year. He, unfortunately,
> had . . . some serious tantrum behaviors which led to some

> of the foster placement disruptions for the children. But since he has been placed with the current family and bonded with them he has been able to find a routine and structure at both school and also in the foster home.
>
> . . . .
>
> [Kim] also is a beautiful, smart, funny, and kind young girl. She is able to bond with others and express her emotions and process those which helps to build trust (inaudible) caregiver and also trusted adults that she may come into contact with. She is outgoing. Very much so. And is very kind. So she is able to make friends and ease into new situations very well.

When describing the children's ability to bond with foster parents, Social Worker Hawthorne testified she has never been concerned about their ability to bond with their past foster parents and was not "at all" concerned about their ability to form a parental bond in the future.

Social Worker Hawthorne then testified regarding a best interests report that she had prepared, where she noted that Kade "is just as bonded to the current placement" as he is with his parents and "has been emotional when leaving the foster family for visits." Regarding Kim's bond with Mother, Social Worker Hawthorne testified that their bond was "very strong[,]" but later clarified their "bond is very strong in terms of more of a friendship and confidante rather than that of a parental bond as [she has] been able to observe between [Kim] and the current foster family -- foster parents and previous foster parents." She based her testimony on her observations where Kim "appears to be more superficial in conversations with her

parents[,]" but is "much more open with her emotions and how she's feeling" with the current foster family.

Also in the best interests report, Social Worker Hawthorne noted Kim has an "internal struggle of [a]doption permanency plan and . . . the unknown of that idea." Kim was attending therapy to address her struggle with the idea of adoption and even "started to open up to [her foster parents] about [her] trauma history and processing of [an] adoption permanency plan." When asked if Kim had indicated her preference, Social Worker Hawthorne testified that Kim "expressed . . . wanting to [be adopted] because she's done with foster care if that is the option for her and her brother. And . . . that she does not want to, but of course she would want to return to her parents like a majority of [] children do." Social Worker Hawthorne believed the termination of Mother's rights would allow Kim and Kade to "move forward legally and in placement," but would also help Kim "emotionally as she continues to struggle significantly, again, with being in foster care for over two years with no progress[.]"

On 18 June 2025, the trial court entered an adjudication order, finding sufficient grounds to terminate Mother's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1), (2), and (6); and a disposition order, concluding it was in Kim's and Kade's best interests for the parental rights of Mother be terminated. Mother timely appealed.

## II. **Jurisdiction**

This Court has jurisdiction to hear Mother's appeal from an order terminating

her parental rights, pursuant to N.C.G.S. §§ 7A-27(b)(2), 7B-1001(a)(7), and 7B-1002(4) (2023).

### III. <u>Standard of Review</u>

"The termination of a parent's parental rights in a juvenile matter is a two-stage process consisting of an adjudicatory stage and a dispositional stage." *In re C.B.*, 375 N.C. 556, 559 (2020). At the adjudicatory stage, "[t]he petitioner bears the burden . . . of proving by 'clear, cogent, and convincing evidence' that one or more grounds for termination exist under section 7B-1111(a) of the North Carolina General Statutes." *In re Z.A.M.*, 374 N.C. 88, 94 (2020) (quoting N.C.G.S. § 7B-1109(f) (2019)). We review a trial court's adjudication "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re N.P.*, 374 N.C. 61, 62–63 (2020) (citation omitted).

If "the trial court finds grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), it proceeds to the dispositional stage where it must 'determine whether terminating the parent's rights is in the juvenile's best interest[.]'" *In re J.J.B.*, 374 N.C. 787, 791 (2020) (quoting N.C.G.S. § 7B-1110(a) (2019)). When a parent appeals a disposition order, this Court "considers whether the trial court abused its discretion in determining that termination of parental rights was in the best interests of the child." *In re D.L.W.*, 368 N.C. 835, 842 (2016). Under the abuse of discretion standard, we "defer to the trial court's decision unless it is manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision." *In re*

*J.J.B.*, 374 N.C. at 791 (citation and internal quotation marks omitted). This Court is "bound by all uncontested dispositional findings[,]" *In re E.F.*, 375 N.C. 88, 91 (2020) (citation omitted), but, if challenged, "[w]e review the trial court's dispositional findings of fact to determine whether they are supported by competent evidence[,]" *In re C.B.*, 375 N.C. at 560 (citation omitted).

## IV. <u>Analysis</u>

Mother's sole argument[4] on appeal is that, since Kim and Kade had strong bonds with Mother and were not in a pre-adoptive placement at the time of the termination proceedings, the trial court abused its discretion when determining it was in the children's best interests that her parental rights be terminated. We disagree.

When determining whether terminating a parent's rights is in the best interest of a juvenile, the trial court must consider the following:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.

---

[4] Although Mother appealed from the trial court's adjudication order as well as the disposition order, she did not present any arguments regarding the adjudicatory order in her brief to this Court. Under Rule 28 of our Rules of Appellate Procedure, "[i]ssues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned." N.C. R. App. P. 28(b)(6) (2025). Since she has not presented an argument regarding the trial court's order finding grounds to terminate Mother's parental rights pursuant to N.C.G.S §§ 7B-1111(a)(1), (2), and (6), Mother abandoned any issues regarding the adjudication order. *See id.*

(4) The bond between the juvenile and the parent.

(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2023). While "[i]t is clear that a trial court must *consider* all of the factors in section 7B-1110(a)[,]" the trial court is not required to make written findings as to each statutory factor. *In re A.U.D.*, 373 N.C. 3, 10 (2019). Rather, the trial court is required to make written findings "only as to those factors for which there is conflicting evidence." *In re E.F.*, 375 N.C. at 91. "Evidence heard or introduced throughout the adjudicatory stage, as well as any additional evidence, may be considered by the court during the dispositional stage." *In re Blackburn*, 142 N.C. App. 607, 613 (2001).

Here, the trial court made the following findings of fact regarding the statutory factors:

> 52. The [c]ourt has considered the six factors enumerated in N.C.G.S. [§] 7B-1110(a).
>
> 53. [Kim] . . . is currently 10 years of age. [Kade] . . . is currently three years of age. The likelihood of the juveniles' adoption is high. [Kade] and [Kim] are both sweet and engaging children who have shown the ability to form parental bonds. The [j]uveniles have the ability to trust with their care givers, and while the current foster family has expressed they only wish to serve as a bridge placement until an adoptive home can be found, the juveniles ha[ve] acclimated well into their home. Social Worker Hawthorne has observed that [Kim], in particular,

is more open with her emotions with her current foster placement than with her biological parents.

54. Termination of the Respondent Parents' parental rights will aid in the accomplishment of the permanent plan of [a]doption of the juveniles by legally freeing the children for adoption. [HCHHS] can then utilize the many avenues available through NC Kids and to locate and recruit pre-adoptive families and prepare the children for adoption.

55. The bond between the juveniles and the []Mother is strong. []Mother consistently attended visitation, and was part of [Kim]'s life prior to coming into the custody of [the agency]. [Kade] has been in the custody of [HCHHS] since he was one [] year old, but understands that Mother is his mother. However, the relationship between the juvenile and []Mother has been observed to be superficial, and both children have exhibited dysregulation following visits. [Kim] has vacillated between expressing her desire to be adopted and her desire to return home to the Respondent Parents.

. . . .

57. While there is no proposed adoptive placement at this time, the juveniles have bonded well with their current foster home. As noted above, the juveniles have shown the ability to build strong familial bonds in their placements, and the current foster home has committed to assisting the juveniles in finding and transitioning into an adoptive placement.

58. While the juveniles have a strong bond with the Respondent Parents, the Respondent Parents have also made minimal progress towards reunification with the juveniles over the last 28 months the juveniles have been in the custody of [HCHHS]. . . . The Respondent Parents have still not provided a single clean drug screen to [HCHHS] since the juveniles entered the custody of [HCHHS], and have not completed substance use treatment. The Respondent Parents also do not have an appropriate home for the juveniles, did not complete

parenting classes until two years after the juveniles come into [HCHHS]'s custody, and continue to accuse [HCHHS] of falsifying their positive drug screens. . . .

59. The conduct of the Respondent Parents has been such as to demonstrate that they will not promote the healthy and orderly physical and emotional wellbeing of the juveniles.

. . . .

61. The juveniles are in need of a Permanent plan of Care at the earliest age possible, and that can be obtained only by the severing of the relationship between the juveniles and the Respondent Parents by termination of the Parents' parental rights.

62. It is in the best interest of the juveniles that the Respondent Parents' parental rights be terminated.

Mother challenges several of these dispositional findings of fact. First, Mother argues Finding of Fact 53 is unsupported by the evidence because "[t]here was no proposed adoptive placement for the children." We find this argument to be without merit as Social Worker Hawthorne testified that Kim and Kade are "loveable[,]" "kind[,]" and "outgoing" children who have not had any issues with forming a parental bond with their previous foster parents and have a "very high" likelihood of being adopted. And although it is true the current foster family was unwilling to adopt Kim and Kade, "the absence of an adoptive placement for a juvenile at the time of the termination hearing is not a bar to terminating parental rights." *In re R.L.R.*, 381 N.C. 863, 881 (2022) (citation omitted) (rejecting the mother's argument that the trial court's finding that "the likelihood of adoption is very good" was based on insufficient

evidence because, according to the mother, the evidence presented only indicated a possibility, not a likelihood, of adoption); *see also In re A.R.A.*, 373 N.C. 190, 200 (2019) (holding the trial court did not abuse it's discretion even though there was evidence that the child was not in a "pre-adoptive placement"). This competent evidence sufficiently supports the trial court's finding regarding the likelihood of the juveniles being adopted.

Next, Mother challenges Finding of Fact 59, arguing there was no evidence the children's relationship with Mother was "truly unsafe" and that Mother had attained housing, completed a parenting course, and consistently visited the children. Indeed, at the disposition hearing, Social Worker Hawthorne testified she had seen a "slight change" in Mother's parenting style after she completed a parenting class in January 2025. But, according to Social Worker Hawthorne's testimony, Mother still had not presented HCHHS with any drug test since the adjudication hearing. Further, the evidence at the adjudication hearing, which the trial court was permitted to consider during the disposition stage, *see In re Blackburn*, 142 N.C. App. at 613, indicated Mother's behavior—i.e., failing to address issues of domestic abuse, refusing to submit to drug screens, and failing to send Kim to school—was not consistent with the health and safety of the children. Thus, Finding of Fact 59 is supported by competent evidence.

Mother also argues Finding of Fact 61 is "inaccurate because guardianship remained a viable option." Guardianship is a dispositional alternative that a trial

court may order if it first determines that doing so would be in the best interest of a child. *See* N.C.G.S. § 7B-903 (2023). In some cases, guardianship may be in the child's best interest, but in others, termination of parental rights would be in the child's best interest. In all cases, however, "the paramount consideration must always be the best interests of the child"; thus, as our Supreme Court has held, a trial court does not abuse its discretion where the trial court considers the dispositional factors set forth in N.C.G.S. § 7B-1110(a) and determines "termination, rather than guardianship, was in the best interests of the juveniles[.]" *In re J.J.B.*, 374 N.C. at795–96 (citing *In re Z.L.W.*, 372 N.C. 432, 438 (2019)). Here, the trial court considered each factor as set forth in N.C.G.S. § 7B-1110(a); "performed a reasoned analysis weighing those factors[,]" *see id.* at 796 (citation omitted); and ultimately determined that terminating Mother's parental rights, rather than the alternative of guardianship, was in Kim's and Kade's best interests.

Lastly, Mother asserts Finding of Fact 62 is unsupported by the evidence when there was evidence that Mother had a strong bond with the children, and the children had no one to adopt them. To support her assertion, Mother relies on *In re J.A.O.*, 166 N.C. App. 222 (2004).

In *In re J.A.O.*, this Court reversed the trial court's order terminating the respondent's parental rights to the minor child because it was in the child's best interest that the family unit remain in-tact. *Id.* at 227. At the time of the termination proceedings, the child—"a troubled" fourteen-year-old teenager who had "a woefully

insufficient support system[,]"—had a history of being verbally and physically aggressive and was diagnosed with several physical and mental health issues. *Id.* at 227–28. Due to the child's "significant and life-long debilitating behaviors[,]" his foster family indicated they were unwilling to adopt the child. *Id.* at 228. Considering the child's age and "unique situation[,]" the child's guardian ad litem argued it was "highly unlikely" the child would be adopted and thus recommended that the respondent's parental rights not be terminated. *Id.* at 226–27. In reviewing this evidence, this Court—albeit recognizing there was a "possibility" that the child would be adopted—concluded that terminating the respondent's parental rights was not in the child's best interest as it would render him a "legal orphan" and "cast [him] further adrift." *Id.* at 227–28.

This case is readily distinguishable from *In re J.A.O.* for several reasons. First, Kim and Kade were not as old as the child in *In re J.A.O.* was at the time of the termination hearing. Second, the kind and degree of Kim's and Kade's physical and mental health conditions are not as severe as the child's in *In re J.A.O.* Third, while it was "highly unlikely" that the troubled child in *In re J.A.O.* would be adopted, Social Worker Hawthorne testified that, since Kim and Kade were "loveable" and "kind[,]" there was a "very high" likelihood they would be adopted. Fourth, unlike J.A.O.'s guardian ad litem's recommendation not to terminate the respondent's parental rights, the guardian ad litem for Kim and Kade recommended termination because it would allow the children "to be legally free for adoption" and "aid [Kim] in

moving forward[, as] continued visitations make processing the situation hard."

Even if this case and *In re J.A.O.* were comparable, "the bond between parent and child is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and the trial court is permitted to give greater weight to other factors." *In re Z.L.W.*, 372 N.C. at 437 (citations omitted). In the instant case, the trial court acknowledged the strong bond between Mother and the children, but also expressed its concerns regarding Mother's "minimal progress towards reunification with the juveniles over the last 28 months"; failure to "provided a single clean drug screen to [HCHHS] since the juveniles entered the custody of [HCHHS]"; failure to complete a substance use treatment; and continuous accusations of HCHHS "falsifying [her] positive drug screens." Thus, we conclude the trial court considered all statutory factors as mandated under N.C.G.S. § 7B-1110(a) and did not abuse its discretion in concluding the termination of Mother's parental rights was in Kim's and Kade's best interests.

## V. <u>Conclusion</u>

After careful review, we conclude the trial court did not abuse its discretion when determining that the termination of Mother's parental rights was in the children's best interests. We therefore affirm the trial court's orders terminating Mother's parental rights to Kim and Kade.

AFFIRMED.

Judges ARROWOOD and HAMPSON concur.

Report per Rule 30(e).